[No. S020126. June 28, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
MARK STEVEN CAHILL, Defendant and Appellant.

## COUNSEL

Janice M. Lagerlof, under appointment by the Supreme Court, for Defendant and Appellant.

Fern M. Laethem, State Public Defender, Robert D. Bacon, Deputy State Public Defender, Wilbur F. Littlefield, Public Defender (Los Angeles), Laurence M. Sarnoff and Douglas J. Goldstein, Deputy Public Defenders, and John M. Sink as Amici Curiae on behalf of Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart and George Williamson, Chief Assistant Attorneys General, Arnold O. Overoye and Robert R. Anderson, Assistant Attorneys General,

W. Scott Thorpe, Edgar A. Kerry, and Shirley A. Nelson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

GEORGE, J.—For a number of years, decisions of both the United States Supreme Court and this court have held that whenever a "coerced" or "involuntary" confession has been received in evidence at a criminal trial, "automatic reversal" of the conviction is required, without regard to the strength of the additional evidence received, unrelated to the confession, that tends to establish the defendant's guilt. (See, e.g., *Payne* v. *Arkansas* (1958) 356 U.S. 560, 568 [2 L.Ed.2d 975, 981, 78 S.Ct. 844]; *People* v. *Berve* (1958) 51 Cal.2d 286, 290 [332 P.2d 97]; *People* v. *Trout* (1960) 54 Cal.2d 576, 585 [6 Cal.Rptr. 795, 354 P.2d 231, 80 A.L.R.2d 1418].) ▮▮ ▮▮ In *Arizona* v. *Fulminante* (1991) 499 U.S. 279 [113 L.Ed.2d 302, 111 S.Ct. 1246] (hereafter *Fulminante*), however, a majority of the United States Supreme Court, in reconsidering the soundness of applying a reversible-per-se rule to the erroneous admission of an involuntary confession[1] *as a matter of federal constitutional law*, concluded that the prejudice caused by the erroneous admission of such a confession properly could and should be evaluated, for purposes of the federal Constitution, under the harmless-beyond-a-reasonable-doubt test (see *Chapman* v. *California* (1967) 386 U.S. 18, 23 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065]) that is applied to virtually all other types of federal constitutional "trial error." (See *Fulminante*, *supra*, 499 U.S. at pp. 306-312 [113 L.Ed.2d at pp. 329-333, 111 S.Ct. at pp. 1263-1266] [opn. of Rehnquist, C. J., speaking for a majority of the court on this issue].) Thus, under *Fulminante*, a state court, without violating the federal Constitution, now may affirm a conviction despite the erroneous admission of an involuntary confession, when the trial record establishes that the admission of the confession was harmless beyond a reasonable doubt. (*Ibid.*)

In this case, we must determine whether, notwithstanding this recent change in *federal* law, *California* law compels the automatic reversal of a

---

[1]Consistently with past usage, we employ the terms "coerced" and "involuntary" confessions interchangeably to refer to confessions obtained by physical or psychological coercion, by promises of leniency or benefit, or when the "totality of circumstances" indicates the confession was not a product of the defendant's "free and rational choice." (See generally 1 LaFave & Israel, Criminal Procedure (1984) § 6.2, pp. 439-451; 1 Witkin, Cal. Evidence (3d ed. 1986) The Hearsay Rule, §§ 614-623, pp. 588-604 [involuntary confessions].) This category does not include confessions that are inadmissible for other reasons—for example, because they have been obtained in violation of the defendant's constitutional right to counsel or by exploitation of an illegal detention or arrest. As we shall see, however, past California decisions have applied a rule of "automatic reversal" to all erroneously admitted confessions and have not drawn any distinctions based upon the reason a particular confession was held inadmissible. (See *post*, pp. 496-497, 502-503)

conviction whenever an involuntary confession has been admitted at trial, or whether, under appropriate circumstances, such error may be considered harmless under state law.

I

At trial, a jury convicted defendant Mark Steven Cahill of numerous offenses, including one count of first degree murder (Pen. Code, §§ 187, 189), [2] one count of robbery (§ 211), one count of rape (§ 261, subd. (a)(2)), three counts of first degree burglary (§ 460, subd. (a)), one count of second degree burglary (§ 460, subd. (b)), and two counts of unlawful taking of a motor vehicle (Veh. Code, § 10851). In conjunction with the first degree murder conviction, the jury found true three special-circumstance allegations —robbery-murder (§ 190.2, subd. (a)(17)(i)), rape-murder (§ 190.2, subd. (a)(17)(iii)), and burglary-murder (§ 190.2, subd. (a)(17)(vii))—and also found that defendant used a deadly weapon in the commission of the murder (§ 12022). At the conclusion of the guilt phase of the proceedings, the prosecution declined to seek the death penalty, and the trial court sentenced defendant to life imprisonment without possibility of parole, consecutive to an aggregate determinate sentence of 14 years.

On appeal, the Court of Appeal reversed all of the murder-related convictions,[3] while affirming the remaining convictions. In reaching its conclusion with regard to the murder-related offenses, the Court of Appeal determined that defendant's confession, obtained during questioning by the police shortly after defendant's arrest and received in evidence as part of the prosecution's case-in-chief, was involuntary or coerced. The Court of Appeal found in this regard that the confession had been elicited by the police through an implied promise of benefit or leniency, arising, in substantial part, from the interrogating officers' inaccurate and misleading statements concerning the legal definition of first degree murder, which omitted any reference to felony murder.[4]

After concluding that the confession was involuntary and thus should not have been admitted at trial, the Court of Appeal went on to hold that the

---

[2]Unless otherwise noted, all section references are to the Penal Code.

[3]The murder-related convictions include the first degree murder conviction and the related special circumstance allegations, the convictions of rape and robbery, and one of the first degree burglary convictions. All of these offenses were committed in the course of the same incident and against the same victim, and were the subject of the challenged portion of defendant's confession.

[4]The Court of Appeal specifically found that "the trial court erred in admitting evidence of defendant's statements in response to interrogation after [Officer] Bell introduced the topic of 'cold blooded premeditated murder,' " and noted that the officer's objectionable statement in this regard occurred after a substantial period of questioning.

admission of the involuntary confession required automatic reversal of the murder-related convictions, without regard to the nature or strength of any other evidence, unrelated to the tainted confession, that had been introduced at trial. In support of this conclusion, the Court of Appeal, in its initial opinion, cited decisions of both this court (*People* v. *Jimenez* (1978) 21 Cal.3d 595, 605 [147 Cal.Rptr. 172, 580 P.2d 672]) and the United States Supreme Court (*Rose* v. *Clark* (1986) 478 U.S. 570, 577 [92 L.Ed.2d 460, 470, 106 S.Ct. 3101]).

The Attorney General, on behalf of the People, sought review, and, while the petition for review was pending, the United States Supreme Court rendered its decision in *Fulminante, supra,* 499 U.S. 279. As noted, in *Fulminante* a majority of the United States Supreme Court overruled a line of that court's decisions that had applied a reversible-per-se or automatic-reversal rule to cases in which an involuntary confession had been admitted at trial, and concluded instead that the erroneous admission of an involuntary confession should be evaluated under the federal "harmless-beyond-a-reasonable-doubt" standard that, in a substantial number of recent United States Supreme Court decisions, had been held applicable to other constitutional "trial errors." (See *id.,* 499 U.S. at pp. 306-314 [113 L.Ed.2d at pp. 329-334, 111 S.Ct. at pp. 1263-1266] (opn. of Rehnquist, C. J.).) After the *Fulminante* decision, we granted review and retransferred this matter to the Court of Appeal for reconsideration in light of *Fulminante.*

After reconsideration, the Court of Appeal reiterated its conclusion that, in view of the trial court's erroneous admission of an involuntary or coerced confession, automatic reversal of the murder-related convictions was required. From its reading of the relevant California precedents, the Court of Appeal concluded that the existing California rule, compelling automatic reversal of a conviction whenever an involuntary or coerced confession is improperly admitted at trial, was grounded on the independent provisions of the California Constitution and not solely on the federal constitutional decisions overruled in *Fulminante.* As a consequence, the Court of Appeal held it was compelled, under the governing California decisions interpreting and applying state law, to reverse the murder-related convictions without undertaking any harmless-error analysis.

Thereafter, we granted the People's subsequent petition for review, specifically limiting the issue to be argued before our court "to whether the state

Constitution compels automatic reversal where a trial court erroneously admits defendant's coerced confession."

## II

At the outset, it may be helpful to clarify the issues that we shall *not* address in this opinion, in light of the contentions of the parties and the limiting order accompanying our grant of review.

First, we do not redetermine whether the circumstances under which defendant's confession was elicited rendered it involuntary or coerced under California law. Past cases establish that the category of involuntary or coerced confessions encompasses a wide range of circumstances and includes not only the most familiar example of confessions extracted from a suspect by means of actual or threatened physical violence or torture (see, e.g., *People* v. *Jones* (1944) 24 Cal.2d 601, 604-611 [150 P.2d 801]), but also confessions elicited by those psychological ploys and interrogation techniques whose use, although less egregious than the resort to physical violence or torture, nonetheless have been deemed to be inconsistent with a defendant's right to be free from compelled self-incrimination. (See, e.g., *People* v. *Quinn* (1964) 61 Cal.2d 551, 552-554 [39 Cal.Rptr. 393, 393 P.2d 705], and cases cited.) The Court of Appeal concluded that the interrogation technique employed during the police questioning of defendant in this case rendered defendant's resulting confession "involuntary" under a long line of cases that have held confessions inadmissible when obtained as a result of express or implied promises, on the part of law enforcement officials, of "leniency" or "benefit" in the event the defendant confesses. (See, e.g., *People* v. *McClary* (1977) 20 Cal.3d 218, 227-230 [142 Cal.Rptr. 163, 571 P.2d 620]; *People* v. *Rogers* (1943) 22 Cal.2d 787, 805-806 [141 P.2d 722]; *People* v. *Barric* (1874) 49 Cal. 342, 345; *People* v. *Johnson* (1871) 41 Cal. 452, 454-455.) As our limiting order suggests, for purposes of our decision in this case we shall assume that the Court of Appeal was correct in finding defendant's confession involuntary.

Second, the Attorney General does not contend in this case that an involuntary or coerced confession is admissible in a criminal trial under current California law, but rather specifically acknowledges "California's strong, longstanding and absolute rule prohibiting the admission into evidence of a confession by a defendant which has been coerced by law enforcement." Accordingly, we have no occasion in this case to decide

whether the "Truth-in-Evidence" provision of Proposition 8—article I, section 28, subdivision (d), of the California Constitution—has altered California law with regard to the inadmissibility of coerced confessions.[5] (Coerced confessions, of course, unquestionably remain inadmissible under federal constitutional principles.) We note, however, that unlike the exclusionary rule applied to evidence obtained as a result of an unconstitutional search or seizure—which in California traditionally has been viewed as a *judicially created remedy* for the violation of constitutionally protected privacy rights (see, e.g., *People* v. *Cahan* (1955) 44 Cal.2d 434, 439-451 [282 P.2d 905, 50 A.L.R.2d 513]; *In re Lance W.* (1985) 37 Cal.3d 873, 883-884, 887 [210 Cal.Rptr. 631, 694 P.2d 744])—the rule barring the admission of an involuntary confession long has been viewed by the California courts as part and parcel of the substance of the California constitutional privilege against self-incrimination (Cal. Const., art. I, § 15), which, by its terms, specifically provides that "[p]ersons may not . . . be compelled in a criminal cause to be a witness against themselves . . . ." (See, e.g, *People* v. *Loper* (1910) 159 Cal. 6, 18-20 [112 P. 720]. See also 1 LaFave, Search and Seizure (2d ed. 1987) § 1.1(a), p. 5 ["*[U]nlike the self-incrimination protection in the Fifth Amendment*, no mention is made [in the text of the Fourth Amendment] of barring from evidence the fruits of a violation of [its] proscription." (Italics added.)].) Thus, although we do not decide the issue, because it has not been litigated in this case, there clearly is a plausible explanation for the Attorney General's decision to refrain from arguing that California law no longer bars the admission of a coerced confession in a criminal trial.

 Accordingly, the sole issue we face is whether, under California law, the erroneous admission of a coerced confession in a criminal trial compels automatic reversal of a conviction on appeal, or whether, under some circumstances, a conviction properly may be upheld on appeal despite the erroneous admission of such a confession at trial.

### III

As noted at the outset, this issue is of practical significance at this time because of the United States Supreme Court's recent decision in *Fulminante, supra,* 499 U.S. 279. Prior to *Fulminante,* a series of decisions by that court—stretching over at least 25 years—had indicated that, under federal constitutional principles, the admission of a coerced confession in a state criminal trial never could be considered harmless error. (See, e.g., *Chapman* v. *California, supra,* 386 U.S. 18, 23 & fn. 8 [17 L.Ed.2d 705, 710];

---

[5]We do address below the question whether Proposition 8 affects the application of California's harmless-error analysis in cases in which a coerced confession is received in evidence. (See, *post,* pp. 499-500.)

*Rose* v. *Clark, supra,* 478 U.S. 570, 577-578 & fn. 6 [92 L.Ed.2d 460, 470-471].)[6] In view of this line of authority, for the past quarter-century California courts have been compelled by federal constitutional principles automatically to reverse a criminal conviction whenever a coerced confession has been admitted at trial, and thus there has been no need, in recent years, to determine whether a similar result was compelled or authorized under California law.

As a result of the *Fulminante* decision, *supra,* 499 U.S. 279, however, the governing federal constitutional rule now has changed. ■ In *Fulminante,* Chief Justice Rehnquist's opinion noted the numerous, recent federal Supreme Court decisions that have applied the federal constitutional harmless-error rule in a great variety of contexts (*id.* at pp. 306-307 [113 L.Ed.2d at pp. 329-330, 111 S.Ct. at p. 1263] [citing 16 decisions]), and concluded that, as in those cases, the erroneous admission of a coerced confession properly should be treated as a "trial error," subject to the ordinary federal harmless-error test of *Chapman* v. *California, supra,* 386 U.S. 18, rather than as a "structural defect" that affects the framework within which the trial proceeds, and that—as not properly subject to federal harmless-error analysis—is considered reversible per se. (499 U.S. at pp. 306-312 [113 L.Ed.2d at pp. 329-333, 111 S.Ct. at pp. 1263-1266].) Accordingly, under *Fulminante,* a state appellate court, without violating the federal Constitution, now may affirm a conviction despite the erroneous admission of a coerced confession, if the court determines that the admission of the confession was harmless beyond a reasonable doubt.

■ The question before us is whether California law, independent of federal constitutional requirements, compels the automatic reversal of a conviction whenever a coerced confession erroneously has been admitted at a criminal trial.

## IV

In resolving the issue of the proper prejudicial error standard under California law, we begin with the governing California constitutional provision. Unlike the United States Constitution, which includes no provision

---

[6]In *Chapman* v. *California, supra,* 386 U.S. 18, the court stated that "our prior cases have indicated that there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error" and cited, as one example, "*Payne* v. *Arkansas,* 356 U.S. 560 [2 L.Ed.2d 975, 78 S.Ct. 844] (coerced confession)." (386 U.S. at p. 23 & fn. 8 [17 L.Ed.2d at p. 710].) And in *Rose* v. *Clark, supra,* 478 U.S. 570, 578, fn. 6 [92 L.Ed.2d 705, 470-471], the court observed that "[e]ach of the examples *Chapman* cited of errors that could never be harmless either aborted the basic trial process, *Payne* v. *Arkansas,* 356 U.S. 560 [2 L.Ed.2d 975, 78 S.Ct. 844] (1958) (use of coerced confession), or denied it altogether, *Gideon* v. *Wainwright,* 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792, 93 A.L.R.2d 733] (1963) (denial of counsel); *Tumey* v. *Ohio,* 273 U.S. 510 [71 L.Ed. 749, 47 S.Ct. 437, 50 A.L.R. 1243] (1927) (biased adjudicator)."

relating to reversible error, the California Constitution contains a specific provision addressed to this subject, article VI, section 13.

This constitutional provision states in full: "No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."

Article VI, section 13, derives directly from former article VI, section 4½ (hereafter, former section 4½), a provision initially added to the California Constitution in 1911.[7] Shortly after the enactment of former section 4½, the meaning and proper application of the provision were considered by this court in *People* v. *O'Bryan* (1913) 165 Cal. 55 [130 P. 1042]. Because of the significance of the *O'Bryan* decision, we review its facts and the analysis of the lead opinion in that case in some detail.[8]

The defendant in *O'Bryan*, a union member, had been charged with murdering a nonunion employee during a strike. At trial, O'Bryan testified in his own behalf, admitting firing the fatal shot but maintaining that he had intended only to frighten, not shoot, the victim. Both in its case-in-chief and in cross-examination of the defendant, the prosecution was permitted to introduce statements that O'Bryan had made to the grand jury shortly after his arrest. When taken before that body, O'Bryan was not represented by counsel and was not informed of his right to decline to be a witness against himself or that his statements might be used against him at trial. The jury convicted him of murder, and he appealed.

---

[7]As initially adopted in 1911, former article VI, section 4½, read: "No judgment shall be set aside, or new trial granted in any criminal case on the ground of misdirection of the jury or the improper admission or rejection of evidence, or for error in any matter of pleading or procedure, unless, after an examination of the entire cause including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."

The provision was amended in 1914 to apply to civil cases as well as criminal cases, and in 1966 was moved to its current location as article VI, section 13, as part of a general reorganization of the California Constitution.

[8]Although, as the dissent notes, the lead opinion in *O'Bryan* was not signed by a majority of the court, throughout the 60 years since that decision that opinion uniformly has been cited and followed in numerous majority opinions as the seminal authority interpreting the harmless-error provision of the California Constitution. (See, e.g., *People* v. *Fleming* (1913) 166 Cal. 357, 381 [136 P. 291] [decided eight months after *O'Bryan*]; *Vallejo etc. R.R. Co.* v. *Reed Orchard Co.* (1915) 169 Cal. 545, 553-554 [147 P. 238]; *People* v. *Sarazzawski* (1945) 27 Cal.2d 7, 11 [161 P.2d 934]; *People* v. *Watson* (1956) 46 Cal.2d 818, 835 [299 P.2d 243]; *People* v. *Collins* (1976) 17 Cal.3d 687, 697-698, fn. 5 [131 Cal.Rptr. 782, 552 P.2d 742].) The dissent does not suggest otherwise.

On appeal, the lead opinion initially concluded that O'Bryan's testimony before the grand jury should not have been admitted at his trial because "[t]he course pursued was in violation of the constitutional right of every person not to 'be compelled, in any criminal case, to be a witness against himself.' (Const. Cal., art. I, sec. 13.)" (165 Cal. at p. 61.) The opinion explained: "Here the defendant, when brought before the grand jury, was in custody under an accusation of guilt of the crime under investigation. Taken into the presence of that body by the sheriff, sworn and examined without the aid of counsel, and without any instruction as to his rights, it cannot be said that his submission to the interrogation was in any fair sense voluntary. The great preponderance of authority is that testimony so given by a defendant is not to be used against him." (*Id.* at p. 62.)

After finding it was constitutional error to admit such statements—statements that "did not amount to a confession, but were admissible in evidence against the defendant as declarations against interest" (165 Cal. at p. 61)— the opinion went on to decide "whether the character and effect of the error were such as to require a reversal," noting that "[t]his question must be answered with due regard to the terms of section 4½ of article VI, added to the constitution by amendment adopted in 1911." (*Id.* at p. 63.)

In addressing this issue, the lead opinion in *O'Bryan* first described the background and purpose of the then-recently adopted constitutional provision. The opinion explained that even prior to the adoption of former section 4 ½, appellate courts in California had recognized their authority to affirm a criminal conviction, despite the existence of error, when the error complained of was "trivial" or did not affect a "substantial right" of the defendant. (165 Cal. at p. 63.)[9] When, however, the error was of a kind "which might or might not have turned the scale against the defendant" (165 Cal. at p. 64), depending upon the facts of the specific case, the appellate courts, prior to the adoption of former section 4½, had interpreted the provisions of former article VI, section 4 (limiting the jurisdiction of appellate courts in criminal cases "to questions of law alone") as precluding "the reviewing courts from weighing the evidence for the purpose of forming an opinion whether the error had or had not in fact worked injury. Having no jurisdiction in matters of fact, the court in which the appeal was pending was bound to apply the doctrine that prejudice was presumed to follow from substantial error." (165 Cal. at p. 64.) The lead opinion in *O'Bryan* noted that this limitation on appellate courts had produced "[i]n not a few instances" unsatisfactory results that hampered the effective and prompt enforcement of

[9]Penal Code section 1258, enacted in 1872, provided (and continues to provide) in this regard: "After hearing the appeal, the court must give judgment without regard to technical errors or defects, or to exceptions, which do not affect the substantial rights of the parties."

the criminal law, requiring the appellate courts "to grant new trials to defendants on account of technical errors or omissions, even though a review of the evidence . . . would have shown that the guilt of the accused had been established beyond question and by means of a procedure which was substantially fair and just." (*Ibid.*)

In light of this background, the lead opinion in *O'Bryan* found that "[t]he general purpose of the [proposal and enactment of former section 4½] is plain" (165 Cal. at p. 63), namely, "to avoid the necessity for such [unsatisfactory] results . . . . By the new constitutional provision the appellate courts are empowered to examine 'the entire cause, *including the evidence*' and are required to affirm the judgment, notwithstanding error, if error has not resulted 'in a miscarriage of justice.' " (*Id.* at p. 64, original italics.)

While acknowledging that the "miscarriage of justice" phrase "is a general one and has not as yet acquired a precise meaning" (165 Cal. at p. 64), the opinion declared that "[t]his much, however, we think may be safely said. Section 4½ of article VI of our constitution must be given at least the effect of abrogating the old rule that prejudice is presumed from any error of law. Where error is shown it is the duty of the court to examine the evidence and ascertain from such examination whether the error did or did not in fact work any injury. The mere fact of error does not make out a *prima facie* case for reversal which must be overcome by a clear showing that no injury could have resulted." (*Id.* at p. 65.)

At the same time, however, the lead opinion in *O'Bryan* made clear that, at least in some contexts, an error might result in a "miscarriage of justice" even when the defendant's guilt was apparent from a review of the evidence. The opinion explained in this regard: "When we speak of administering 'justice' in criminal cases, under the English or American system of procedure, we mean something more than merely ascertaining whether an accused is or is not guilty. It is an essential part of justice that the question of guilt or innocence shall be determined by an orderly legal procedure, in which the substantial rights belonging to defendants shall be respected. For example, if a court should undertake to deny to a defendant charged with a felony the right of trial by jury, and after a hearing of the evidence render a judgment of conviction, it cannot be doubted that such judgment should be set aside even though there had been the clearest proof of guilt. Or, if a defendant, after having been once acquitted, should again be brought to trial and thereupon convicted, in disregard of his plea that he had been once in jeopardy, it would hardly be suggested that because he was in fact guilty, no 'miscarriage of justice' had occurred." (165 Cal. at pp. 65-66.)

Nonetheless, the opinion was careful to emphasize that "it does not follow that every invasion of even a constitutional right necessarily requires a

reversal. It may well be that the court, after examining the 'entire cause including the evidence,' is of the opinion that the error complained of, whatever its character, has not resulted in a miscarriage of justice. The mere fact that the assignment of error is based upon a provision of the constitution is not conclusive. The final test is the opinion of the appellate court upon the result of the error." (165 Cal. at p. 66.)

Finally, applying former section 4½ to the facts of the *O'Bryan* case itself, the lead opinion concluded that despite the trial court's constitutional error in permitting the defendant's statements to the grand jury to be considered by the jury, the judgment should be affirmed. In reaching this conclusion, the court reviewed the evidence as a whole, finding that all the facts disclosed in the defendant's grand jury statements had been established at trial by other, admissible evidence. The court held that, under such circumstances, "we should certainly not be justified in forming or expressing the opinion that the admission of this testimony had resulted in a miscarriage of justice." (165 Cal. at p. 67.)

The seminal decision in *O'Bryan, supra,* 165 Cal. 55, holds significance for the present case in a number of respects. First, *O'Bryan* made it clear that the California constitutional provision governing reversible error—now article VI, section 13—applies to constitutional as well as to nonconstitutional errors. Second, *O'Bryan* also explained that although, as a general rule, the determination whether an error has resulted in a "miscarriage of justice" within the meaning of the constitutional provision will depend upon an appellate court's evaluation of the effect of the error in light of the evidence at trial, in some contexts—for example, the erroneous denial of a defendant's right to jury trial—an error may result in a miscarriage of justice, and require reversal, regardless of the strength of the evidence properly received at trial.

The Attorney General, while acknowledging the passage in *O'Bryan, supra,* 165 Cal. at pages 65-66, that indicates that some errors, like the denial of a jury trial, may result in a miscarriage of justice without regard to the state of the evidence introduced at trial, contends that this court's subsequent decision in *People* v. *Watson, supra,* 46 Cal.2d 818, vitiated this aspect of the *O'Bryan* analysis by "crystallizing" the various definitions of the phrase "miscarriage of justice" into what generally is referred to as the "reasonable probability" test.

We believe this portion of the Attorney General's argument rests upon a misreading of the *Watson* decision. In *Watson,* this court reviewed and summarized the general principles relating to the constitutional harmless-error provision established in the *O'Bryan* decision. We then explained that

a number of decisions following *O'Bryan*—decisions that generally involved ordinary error and a need to evaluate the evidence in order to determine whether a miscarriage of justice had resulted—had employed varying language in attempting to articulate a general standard or test for determining when such an error, viewed in light of the evidence introduced at trial, would be serious enough to amount to a miscarriage of justice under the constitutional provision. In this regard, the court noted in *Watson* that several decisions had resorted to a double negative in formulating a test (stating, for example, that reversal would be required if the appellate court "is of the opinion that 'a different result would not have been improbable had the error not occurred' . . . or 'if it cannot be said that, in the absence of the error complained of, a different verdict would have been improbable . . .' "), whereas other decisions had utilized alternative, affirmative linguistic formulations (such as "that 'it must affirmatively appear to the satisfaction of this court . . . that the accused may well have been substantially injured by the error of which he complains' . . . [or] that there should be no reversal where 'it appears that a different verdict would not otherwise have been probable' "). (See 46 Cal.2d at p. 836, citations omitted.)

■ In order to eliminate the confusion wrought by this variety of differently worded tests, this court in *Watson* proceeded to articulate a single standard to be employed in this context, holding that "it appears that the test generally applicable may be stated as follows: That a 'miscarriage of justice' should be declared only when the court 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People* v. *Watson, supra*, 46 Cal.2d at p. 836.) This, of course, is the familiar "reasonably probable" standard that represents the harmless-error test generally applicable under current California law.

In setting forth this statement of the "generally applicable" harmless error test, however, the *Watson* decision did not purport to overrule or disapprove that portion of the *O'Bryan* decision recognizing that with regard to *some* errors—such as a denial of the right to jury trial—a "miscarriage of justice" would result from the denial of the right itself, without regard to the state of the evidence. Indeed, the *Watson* decision, in restating the principles declared by the *O'Bryan* case, specifically recognized that under *O'Bryan* "certain fundamental rights . . . are guaranteed to the defendant upon which he can insist regardless of the state of the evidence, such as the right to a jury trial and the right to protection under the plea of once in jeopardy . . . ." (*People* v. *Watson, supra*, 46 Cal.2d at p. 835.) Nothing in the *Watson* decision suggests the court contemplated that its "reasonable probability" test should or would apply to this limited category of error.

Furthermore, in the 37 years since *Watson, supra,* 46 Cal.2d 818, California cases have continued to follow the latter aspect of *O'Bryan, supra,* 165 Cal. 55, in a number of contexts, finding that certain errors, by their nature, result in a "miscarriage of justice" within the meaning of the California harmless-error provision requiring reversal without regard to the strength of the evidence received at trial. (See, e.g., *People* v. *Douglas* (1964) 61 Cal.2d 430, 436-439 [38 Cal.Rptr. 884, 392 P.2d 964] [improper denial of right to separate counsel]; *People* v. *Mroczko* (1983) 35 Cal.3d 86, 104-105 [197 Cal.Rptr. 52, 672 P.2d 835] [improper representation by counsel with potential conflict of interest]; *People* v. *Holmes* (1960) 54 Cal.2d 442 [5 Cal.Rptr. 871, 353 P.2d 583] [ineffectual waiver of right to jury trial]; *People* v. *Wheeler* (1978) 22 Cal.3d 258, 283 [148 Cal.Rptr. 890, 583 P.2d 748] [discrimination in selection of jury]. See generally 6 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Reversible Error, §§ 3303-3311, pp. 4084-4095.) As these decisions demonstrate, just as the United States Supreme Court recognized in its recent *Fulminante* decision that certain federal constitutional errors representing "structural defects in the constitution of the trial mechanism" are not amenable to harmless error analysis (*Fulminante, supra,* 499 U.S. 279, 309-310 [113 L.Ed.2d 302, 331-332, 111 S.Ct. 1246, 1265] (opn. by Rehnquist, C. J.)), under the California constitutional harmless-error provision some errors similarly are not susceptible to the "ordinary" or "generally applicable" harmless-error analysis—i.e., the *Watson* "reasonably probable" standard—and may require reversal of the judgment notwithstanding the strength of the evidence contained in the record in a particular case.

Accordingly, the issue presented by this case is whether, under California law, the admission at trial of a coerced confession is the kind of error, such as the denial of a jury trial, that results in a "miscarriage of justice" under article VI, section 13, without regard to the nature and strength of the additional evidence presented at trial, or whether, like most trial errors (including constitutional errors), the question whether the erroneous admission of such a confession warrants reversal under article VI, section 13, properly must be determined with due regard to all of the evidence received at trial.

V

Defendant argues that, as an historical matter, coerced confessions always have been considered by the California cases as the type of error that is subject to a reversible-per-se rule. The Attorney General, however, challenges defendant's reading of the past California case law.

A review of the relevant California decisions—i.e., those rendered since 1911[10]—reveals that from the enactment of former section 4½ in 1911 until the late 1950's, each of the California decisions that addressed the question whether a trial court had erred in admitting a coerced confession, or in instructing the jury with regard to the determination of the voluntariness of a confession, assessed the prejudicial effect of such potential error in light of all the evidence that had been introduced at trial, and did not hold or suggest that the erroneous admission or improper consideration of such a confession, in itself, automatically amounted to a "miscarriage of justice" under former section 4½. (See, e.g., *People* v. *Stroble* (1951) 36 Cal.2d 615, 623-624, 631 [226 P.2d 330]; *People* v. *Gonzales* (1944) 24 Cal.2d 870, 877-878 [151 P.2d 251]; *People* v. *Jones, supra,* 24 Cal.2d 601, 604; *People* v. *Rogers, supra,* 22 Cal.2d 787, 803-807; *People* v. *Ferdinand* (1924) 194 Cal. 555, 565-570 [229 P. 341]; *People* v. *Sourisseau* (1944) 62 Cal.App.2d 917, 930-931 [145 P.2d 916]; *People* v. *Mellus* (1933) 134 Cal.App. 219, 220-226 [25 P.2d 237]; *People* v. *Day* (1932) 125 Cal.App. 106, 110-111 [13 P.2d 855]; *People* v. *Dye* (1931) 119 Cal.App. 262, 271-273 [6 P.2d 313]; *People* v. *Reed* (1924) 68 Cal.App. 19, 20 [228 P. 361].)

Beginning in the late 1950's, however, California decisions took a different view of the matter and, thereafter, a host of cases from this court consistently declared that whenever a coerced confession had been admitted in a criminal trial, reversal of the conviction was required without regard to the strength of the other evidence revealed by the record. (See, e.g., *People* v. *Berve, supra,* 51 Cal.2d 286, 290; *People* v. *Trout, supra,* 54 Cal.2d 576, 585; *People* v. *Brommel* (1961) 56 Cal.2d 629, 634 [15 Cal.Rptr. 909, 364 P.2d 845]; *People* v. *Matteson* (1964) 61 Cal.2d 466, 469-470 [39 Cal.Rptr. 1, 393 P.2d 161]; *People* v. *Dorado* (1965) 62 Cal.2d 338, 356-357 [42 Cal.Rptr. 169, 398 P.2d 361]; *People* v. *Schader* (1965) 62 Cal.2d 716, 728-731 [44 Cal.Rptr. 193, 401 P.2d 665]; *People* v. *Sears* (1965) 62 Cal.2d 737, 743 [44 Cal.Rptr. 330, 401 P.2d 938]; *People* v. *Fioritto* (1968) 68 Cal.2d 714, 720 [68 Cal.Rptr. 817, 441 P.2d 625]; *People* v. *Randall* (1970) 1 Cal.3d 948, 958 [83 Cal.Rptr. 658, 464 P.2d 114]; *People* v. *McClary, supra,* 20 Cal.3d 218, 230; *People* v. *Jimenez, supra,* 21 Cal.3d 595, 605-606.) The court's statement in *Matteson* of the applicable legal rule is typical of this line of cases: "In cases involving involuntary statements of the accused . . . the weight of other evidence of guilt is not considered.

---

[10]Although defendant cites and relies upon a number of California cases that predate the enactment of article VI, section 4½ (see, e.g., *People* v. *Loper, supra,* 159 Cal. 6, 20-21 [decided in 1910]), such cases—decided prior to the enactment of the California constitutional provision presently governing reversible error—shed no light upon the question whether the admission of an involuntary confession amounts to a "miscarriage of justice" under article VI, section 13, so as to compel reversal without regard to the other evidence received at trial.

Incriminating statements from defendant's own tongue are most persuasive evidence of his guilt, and the part they play in securing a conviction cannot be determined." (*People* v. *Matteson, supra,* 61 Cal.2d at p. 470.)

The Attorney General, although acknowledging the body of California case law set forth in the preceding paragraph, contends that the reversible-per-se rule embodied in these numerous California decisions did not emanate from the application of an independent, *California* standard for coerced confessions, but instead simply reflected the California courts' application of a *federal* reversible-per-se standard, consistent with the prejudicial error analysis applied by the United States Supreme Court in a number of its prior decisions. In advancing this claim, the Attorney General relies, in part, upon a passage contained in a footnote in one of our recent decisions, suggesting that the California reversible-per-se rule for confessions was "never expressly divorced from federal law." (*People* v. *Boyer* (1989) 48 Cal.3d 247, 279-280, fn. 23 [256 Cal.Rptr. 96, 768 P.2d 610].) Based upon this premise—i.e., that the California reversible-per-se rule always has been inextricably linked to federal law—the Attorney General maintains that now that the *Fulminante* decision has modified the governing federal prejudicial-error standard applicable to coerced confessions, it follows that the California reversible-per-se rule no longer is viable. Defendant contends, by contrast, that the prior California cases embody a California prejudicial error rule that was based upon state, rather than federal, law.

Upon a close review of the California cases in question, we conclude that although the decisions consistently cited both state and federal authorities,[11] and occasionally included language suggesting that the reversible-per-se rule

---

[11]In *People* v. *Berve, supra,* 51 Cal.2d 286, the initial decision in this line of cases, the relevant passage (*id.* at p. 290) reads: "The use of confessions in a criminal prosecution obtained by force, fear, promise of immunity or reward constitutes a denial of due process under the federal and state Constitutions requiring a reversal of the convictions although other evidence may be consistent with guilt. (*Brown* v. *Mississippi,* 297 U.S. 278, 285-286 [56 S.Ct. 461, 80 L.Ed. 682]; *Ashcraft* v. *Tennessee,* 322 U.S. 143 [64 S.Ct. 921, 88 L.Ed. 1192]; *Malinski* v. *New York,* 324 U.S. 401 [65 S.Ct. 781, 89 L.Ed. 1029]; *People* v. *Siemsen,* 153 Cal. 387, 394 [95 P. 863]; see *People* v. *Sarazzawski,* 27 Cal.2d 7 [161 P.2d 934].)"

Although this passage makes clear that the *Berve* court's application of a reversible-per-se rule was grounded in part on the federal Constitution, inasmuch as the court also explicitly referred to the state Constitution and cited the *Sarazzawski* case, *supra,* 27 Cal.2d 7, which had held that another type of constitutional error (the failure to provide a fair opportunity to be heard) was reversible-per-se under the California constitutional harmless-error provision (see 27 Cal.2d at p. 18), it appears reasonable to interpret the *Berve* opinion as holding that the reversible-per-se rule for involuntary confessions also was mandated independently by the state Constitution.

was applicable only by virtue of federal law,[12] the decisions reveal that, at least by the mid-1960's, this court had adopted the position that a reversible-per-se rule applied to the erroneous admission of confessions *as a matter of state law*, independent of any federal compulsion.

The analysis in *People* v. *Schader, supra,* 62 Cal.2d 716, 728-731, illustrates the point. In *Schader,* after concluding that a confession that was admitted at trial should have been excluded because it had been obtained in violation of the defendant's right to counsel, the court observed: "Once we have determined that an admission of an incriminating statement constitutes error, *we must decide whether or not the error caused prejudice to defendant under article VI, section 4½ of the Constitution.* (See *People* v. *Watson* (1956) 46 Cal.2d 818, 836-837 [299 P.2d 243].) *The statements involved in the instant case, however, are confessions* to murder in the first degree under the felony murder rule [citation] and to robbery in the first degree [citations] *and we have held that the erroneous admission of a confession is prejudicial per se and therefore compels reversal.* [Citing seven California decisions without specifying whether their holdings were premised upon federal or state law.]" (*Schader, supra,* at pp. 728-729, italics added.)

Although the *Schader* court thereafter noted the then-applicable United States Supreme Court decisions holding that "the introduction of an *involuntary* confession automatically requires reversal" (62 Cal.2d at p. 729, italics added), the *Schader* court went on to hold that automatic reversal was required under the California prejudicial-error rule *whenever an illegally obtained confession was admitted into evidence, regardless whether the confession was "voluntary" or "involuntary."* The *Schader* court explained its conclusion as follows: "In determining the prejudicial effect of the illegally obtained confession at trial we are not concerned with the nature of the error that caused the illegality. The *reason* that the confession should not have been introduced into evidence is no longer material. As to its impact upon the jury and the prejudicial effect, the confession obtained in violation of defendant's right to counsel cannot be distinguished from the confession obtained in violation of defendant's right to be free of coercion. [¶] In this inquiry we cannot logically distinguish between the different bases for the exclusion of the confession. . . . After holding that the confession should not have been admitted, we can only be concerned with the effect of the confession upon the jury's deliberation, regardless of the type of error

---

[12]Thus, in *People* v. *Brommel, supra,* 56 Cal.2d 629, 634, the court stated the applicable reversible-per-se rule in the following terms: "Apart from his confessions, the case against defendant was wholly circumstantial, but however strong the case otherwise the admission of involuntary confessions compels a reversal, and section 4½, article VI, of the Constitution can under no circumstances save the judgment."

involved. It is because of the effect of the confession that reversal is compelled. [¶] . . . In either case [i.e., whether the confession is "voluntary" or "involuntary"] the confession operates as a kind of evidentiary bombshell which shatters the defense." (*Id.* at pp. 729-731.)

Thus, although the *Schader* court drew upon analogous federal decisions for support, the court's holding in *Schader* went beyond the then-existing federal authority in applying a reversible-per-se rule to confessions that were not involuntary but were inadmissible because obtained, for example, in violation of the precepts of the *Massiah* or *Escobedo* decisions (see *Massiah* v. *United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199]; *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758]). *Schader* appears clearly to have been based upon the view that the erroneous admission of *any* confession was prejudicial per se *as a matter of California law*. And, as the language and reasoning of the *Schader* opinion demonstrate, the decision clearly indicated that this reversible-per-se rule of state law was applicable to involuntary confessions.

In the subsequent decision in *People* v. *Jacobson* (1965) 63 Cal.2d 319, 329-331 [46 Cal.Rptr. 515, 405 P.2d 555], this court explicitly reconfirmed the independent *state* basis of the general reversible-per-se rule applied by the California decisions of that period. The question presented in *Jacobson* was whether the reversible-per-se rule should be applied when, although two confessions of the defendant obtained in violation of his right to counsel had been introduced at trial, eight valid confessions, obtained from the defendant prior to the invalid confessions and thus untainted by those confessions, also had been introduced at trial and had disclosed all of the material facts contained in the invalid confessions.

In analyzing the issue, the court in *Jacobson* explained that two distinct reasons had been advanced in support of the application of a reversible-per-se rule to invalidly obtained confessions. "One view holds that when a confession is obtained by methods which violate constitutional rights, law enforcement officials must suffer the penalty of reversal if such a confession is used at trial. This harsh result, contend the advocates of this view, is the only means by which illegal police activity can be successfully checked. *The United States Supreme Court has expressed this view in exercising its supervisory power over the administration of criminal justice in the federal courts.* [Citation.]" (63 Cal.2d at pp. 329-330, italics added.)

The *Jacobson* court continued: "*In California, however, we have taken a somewhat different view*, while recognizing the beneficial effect that results when police investigations are conducted within the constitutional framework. *This court has been more concerned with the fairness of the trial, and*

*we are of the opinion that 'courts cannot inquire into the prejudicial nature of the introduction of an illegally obtained confession for the reasons stated in People* v. *Parham* (1963) 60 Cal.2d 378, 385 [33 Cal.Rptr. 497, 384 P.2d 1001]: *"Almost invariably . . . a confession will constitute persuasive evidence of guilt,* and it is therefore usually extremely difficult to determine what part it played in securing the conviction. [Citation omitted.] These considerations justify treating involuntary confessions as a class by themselves and refusing to inquire whether in rare cases their admission in evidence had no bearing on the result." ' [Citation.]" (63 Cal.2d at p. 330, italics added.)

Because the California reversible-per-se rule applicable to confessions was premised upon the significant role that the introduction of a defendant's confession was presumed to play in any criminal trial, the court in *Jacobson* concluded that in the unusual factual setting presented by that case, involving eight valid and two invalid confessions, "a refusal to inquire into the impact, if any, of the confession on the verdict would result in complete abandonment of article VI, section 4½ of the California Constitution." (63 Cal.2d at p. 330.) After reviewing the contents of the confessions and determining that "[t]he two improperly obtained statements were . . . merely cumulative," the court concluded: "It is not plausible, having reviewed this record, to conclude that 10 statements were sufficiently more persuasive than only eight and that the elimination of two would have altered the outcome." (*Id.* at p. 331.) On this basis, the court ultimately determined that the error in admitting the confessions did not warrant reversal under article VI, section 4½, of the California Constitution.

The *Jacobson* decision is significant in a number of respects in our evaluation of the issue presently before us. As we shall discuss below, the opinion in *Jacobson* not only provides a clear explanation of the rationale underlying the California courts' application of a reversible-per-se rule to erroneously admitted confessions, but at the same time reveals a telling flaw in that rationale. For present purposes, however, the *Jacobson* opinion is instructive in demonstrating rather clearly that, at least by 1965, the reversible-per-se rule applied by California decisions to improperly admitted confessions represented an application of *state* law under the pertinent state constitutional prejudicial-error provision, rather than simply an application of *federal* law.

As a jurisprudential matter, it is not surprising to find that the California decisions of that time, such as *Schader, supra,* 62 Cal.2d 716, and *Jacobson, supra,* 63 Cal.2d 319, relied upon state law, and not solely upon federal law, in determining whether an error committed at trial, even an error of federal

constitutional magnitude, warranted reversal of a state court judgment. Although numerous federal decisions previously had held that the admission of an involuntary confession was reversible per se, prior to the United States Supreme Court's 1967 decision in *Chapman* v. *California, supra,* 386 U.S. 18, the federal high court never had held that state courts were compelled, by virtue of the federal Constitution, to apply a *general, federal harmless-error standard* in evaluating whether a federal constitutional error that occurred in a state trial required reversal of the conviction. As Justice Harlan's dissenting opinion in *Chapman* makes clear, the majority opinion in *Chapman* broke new ground in adopting a general, federal constitutional harmless-error standard in that case. (*Id.* at pp. 46-51 [17 L.Ed.2d at pp. 723-726].) Justice Harlan's dissent in *Chapman* also reveals that, prior to *Chapman,* California courts regularly applied the California prejudicial-error standard prescribed by the state Constitution to other types of federal constitutional error occurring in California trials. (*Id.* at pp. 51-53 [17 L.Ed.2d at pp. 725-727]; see also *People* v. *Bostick* (1965) 62 Cal.2d 820, 823-827 [44 Cal.Rptr. 649, 402 P.2d 529].)

Accordingly, in light of the specific language of the California cases decided in the 1960's, and the then-prevailing understanding of the reach of state prejudicial-error principles, we determine it was as a matter of state law that the California decisions in question characterized as reversible per se the erroneous receipt in evidence of a confession. (See also *People* v. *Powell* (1967) 67 Cal.2d 32, 56 [59 Cal.Rptr. 817, 429 P.2d 137] ["[S]ince the decision in *Chapman* v. *California* (1967) *supra,* 386 U.S. 18, 23 [17 L.Ed.2d 705, 710], our inquiry may not be limited to that consideration [i.e., the strength of the admissible evidence of defendant's guilt] when a federal constitutional error is in issue, and we may no longer rely on article VI, section 13 of our Constitution to save a judgment infected with such an error."].)

## VI

The Attorney General argues, however, that even if past California decisions (at least those rendered since the mid-1960's) applied a reversible-per-se rule to confessions as a matter of state law, the Truth-in-Evidence provision of Proposition 8 (Cal. Const., art, I, § 28, subd. (d)), enacted in 1982, mandates application of federal rather than state law, insofar as state law now imposes a more stringent test of prejudicial error than that embodied in federal law under *Fulminante, supra,* 499 U.S. 279. In support of this argument, the Attorney General relies upon this court's decisions in *People* v. *May* (1988) 44 Cal.3d 309 [243 Cal.Rptr. 369, 748 P.2d 307] and *People* v. *Markham* (1989) 49 Cal.3d 63 [260 Cal.Rptr. 273, 775 P.2d 1042],

which held that more stringent, judicially created state rules, relating to the admission of statements allegedly obtained in violation of the privilege against self-incrimination, have been abrogated by Proposition 8.

The provision of Proposition 8 in question, however, does not support the Attorney General's argument. By its terms, the Truth-in-Evidence provision affects only the *admissibility* of evidence,[13] largely eliminating state law rules that restricted the admissibility of relevant evidence more narrowly than was required by the federal Constitution. (See, e.g., *In re Lance W.*, *supra*, 37 Cal.3d 873, 884-890; *People* v. *Wheeler* (1992) 4 Cal.4th 284, 290-295 [14 Cal.Rptr.2d 418, 841 P.2d 938].) There is nothing in the Truth-in-Evidence provision that purports to affect the standard for determining *the prejudicial effect*, under state law, of the introduction at trial of evidence that remains inadmissible under California law. (See, e.g., *People* v. *Porter* (1990) 221 Cal.App.3d 1213, 1222 [270 Cal.Rptr. 773].) As noted at the outset of this opinion (see, *ante*, pp. 485-486), the Attorney General has not argued that Proposition 8 renders coerced confessions admissible under California law, and we conclude that the provisions of that initiative measure have no direct application to the issues presented by this case.

## VII

Although we have determined that the reversible-per-se rule applied by a substantial number of California decisions in the 1960's to the erroneous admission of confessions was grounded in state law, and that this state prejudicial-error rule has not been abrogated by the Truth-in-Evidence provision of Proposition 8, these conclusions are not dispositive of the issue before us. Even though it follows, from the foregoing determinations, that the United States Supreme Court's recent decision in *Fulminante*, *supra*, 499 U.S. 279, does not, of its own force, modify the existing California rule requiring automatic reversal of a conviction based upon proceedings in which a confession erroneously has been received, the *Fulminante* decision does provide us with an appropriate opportunity to reconsider the validity of the reversible-per-se rule as a matter of California law. Although, as we have seen, the past California decisions applied a rule of automatic reversal as a matter of state law, those California decisions did not adopt such a state rule in the face of a contrary federal harmless error rule, but rather embraced that rule on the understanding that such a rule was consistent with the governing federal rule. ■ Now that the federal high court has established

---

[13]The Truth-in-Evidence provision reads in relevant part: "Except as provided by statute hereafter enacted by a two-thirds vote . . . of the Legislature, relevant evidence shall not be excluded in any criminal proceeding . . . ." (Cal. Const., art. I, § 28, subd. (d).)

in *Fulminante* that a rule of automatic reversal is not compelled by the federal Constitution, we consider it appropriate to reconsider whether such automatic reversal is mandated under the state Constitution.

As we have discussed above, the California Constitution, unlike its federal counterpart, contains an explicit provision that directly addresses the issue of reversible error—a section added by the electorate of this state for the specific purpose of *abrogating* the preexisting rule that had treated any substantial error as reversible per se. In its current form, the provision reads in pertinent part: "No judgment shall be set aside, . . . in any cause, *on the ground . . . of the improper admission* or rejection *of evidence*, . . . unless, *after an examination of the entire cause, including the evidence*, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) On its face, this language would appear to apply as fully to the improper admission of an involuntary confession as to the improper admission of any other type of evidence, and to require that, in determining whether a judgment should be set aside because of such an improper admission of evidence, a court examine all of the evidence received at trial in order to ascertain whether the error resulted in a miscarriage of justice. Because, as we have seen, it has been clear from the time of its enactment that the California reversible-error provision applies to constitutional as well as to nonconstitutional errors (see *People* v. *O'Bryan*, *supra*, 165 Cal. 55, 66), the language and background of the applicable state constitutional provision do not appear to support a rule that treats the improper admission of an involuntary confession (uniquely, among evidentiary errors) as reversible per se.

Of course, as the *O'Bryan* decision recognized, in some instances an error may result in a "miscarriage of justice" within the meaning of the California provision without regard to the strength of the evidence presented at trial, because, as the court explained in *O'Bryan*, "[w]hen we speak of administering 'justice' in criminal cases, under the English or American system of procedure, we mean something more than merely ascertaining whether an accused is or is not guilty. It is an essential part of justice that the question of guilt or innocence shall be determined *by an orderly legal procedure*, in which the substantial rights belonging to defendants shall be respected." (165 Cal. at p. 65, italics added.) But the kinds of errors that, regardless of the evidence, may result in a "miscarriage of justice" because they operate to deny a criminal defendant the constitutionally required "orderly legal procedure" (or, in other words, a fair trial)—for example, the denial of the defendant's right to a jury trial or to an impartial trial judge (see, e.g., *People* v. *Mahoney* (1927) 201 Cal. 618, 626-627 [258 P. 607])—all involve fundamental "structural defects" in the judicial proceedings, analogous to those to

which the United States Supreme Court referred in its *Fulminante* decision (*Fulminante, supra*, 499 U.S. 279, 309-310 [113 L.Ed.2d 302, 331-332, 111 S.Ct. 1246, 1265]), rather than the improper admission of a particular item of evidence.

As Chief Justice Rehnquist explained in *Fulminante*, in contrast to fundamental "structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards" (499 U.S. at p. 309 [113 L.Ed.2d at pp. 331-332, 111 S.Ct. at p. 1265]), the improper admission of an involuntary confession is a type of "trial error"—that is, "[an] error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was [prejudicial or harmless]." (*Id.* at pp. 307-308 [113 L.Ed.2d at p. 330, 111 S.Ct. at p. 1264].) As we have seen, the California reversible-error provision, by its terms, directs that the prejudicial nature of such an evidentiary error be determined "after an examination of the entire cause, including the evidence." (Cal. Const., art. VI, § 13.)

As discussed above, for more than 40 years after the adoption in 1911 of the California constitutional reversible-error provision, California courts applied ordinary prejudicial-error analysis in determining whether the admission of an involuntary confession in a criminal trial warranted reversal of the judgment. (See, *ante*, pp. 493-494.)[14] It was only in the late 1950's that California decisions began to hold that the erroneous admission of an involuntary confession was reversible per se. (See, *ante*, pp. 494-495.)

In explaining the basis for their application of a reversible-per-se rule in this context, the California decisions of the 1950's and 1960's did not suggest that the erroneous admission of a confession constituted a structural defect in the trial proceedings that deprived the defendant of the "orderly legal process" constituting a fair trial. Instead, the decisions reasoned that a rule of automatic reversal was justified in light of the significant role a defendant's confession "almost invariably" plays in any criminal trial in which it is introduced. Thus, as we have seen, the *Jacobson* decision, *supra*, 63 Cal.2d 319, in explaining the differences between the rationales offered by the federal and California courts for the adoption of a reversible-per-se rule with regard to improperly admitted confessions, observed that the

---

[14]The suggestion in the dissenting opinion of Justice Mosk that California law always has treated the improper admission of an involuntary confession as undermining the fairness of a trial, and as requiring reversal without regard to the strength of the prosecution's other evidence, is inconsistent with the treatment of the prejudicial error question in the numerous Supreme Court and Court of Appeal cases decided between 1911 and 1958. (*See, ante*, p. 494.)

California decisions rested upon the proposition that " 'courts cannot inquire into the prejudicial nature of the introduction of an illegally obtained confession for the reasons stated in *People* v. *Parham* (1963) 60 Cal.2d 378, 385 [33 Cal.Rptr. 497, 384 P.2d 1001]: "Almost invariably . . . a confession will constitute persuasive evidence of guilt, and it is therefore usually extremely difficult to determine what part it played in securing the conviction. [Citation omitted.] These considerations justify treating involuntary confessions as a class by themselves and refusing to inquire whether in rare cases their admission in evidence had no bearing on the result." ' [Citation.]" (63 Cal.2d at p. 330.) And the *Schader* decision, *supra,* 62 Cal.2d 716, relied upon that same rationale in concluding that the California reversible-per-se rule applied *whenever* a confession erroneously was received at trial, without regard to whether the confession was "voluntary" or "involuntary," or whether it had been elicited in violation of the right to counsel or the privilege against self-incrimination, or was inadmissible for some other reason. *Schader* explained that, in any event, "the confession operates as a kind of evidentiary bombshell which shatters the defense." (62 Cal.2d at p. 731. See also *People* v. *Quicke* (1969) 71 Cal.2d 502, 516 [78 Cal.Rptr. 683, 455 P.2d 787].)

In relying upon this rationale as a basis for embracing a rule of automatic reversal whenever a confession is improperly admitted at trial, however, the California decisions in question lost sight of the principal purpose and significance of the 1911 enactment of California's constitutional provision explicitly addressing the matter of reversible error. The recognition that confessions, "as a class," "[a]lmost invariably" will provide persuasive evidence of a defendant's guilt (*People* v. *Parham, supra,* 60 Cal.2d 378, 385), and that such confessions often operate "as a kind of evidentiary bombshell which shatters the defense" (*People* v. *Schader, supra,* 62 Cal.2d 716, 731), simply means that the improper admission of a confession is much more likely to affect the outcome of a trial than are other categories of evidence, and thus is much more likely to be prejudicial under the traditional harmless-error standard. But, although the improper admission of a confession is likely to be prejudicial in many cases, that consequence does not, in our view, justify the judicial adoption of a state-law rule that automatically and monolithically treats *all* improperly admitted confessions as requiring reversal of the defendant's conviction; the California constitutional reversible-error provision was adopted for the specific purpose of eliminating just such a prophylactic approach to reversible error.[15]

Indeed, although this court's 1965 decision in *People* v. *Jacobson, supra,* 63 Cal.2d 319, did not purport to question or modify the general reversible-per-se rule applicable to confessions, the reasoning and holding of *Jacobson*

---

[15]Although the dissenting opinion of Justice Mosk suggests that the rule of automatic reversal applied by past California cases to the improper admission of an *involuntary* confession is distinguishable from, and was based upon a rationale different from, the

in fact reveals that the reversible-per-se rule is basically incompatible with the precepts of the California constitutional provision that addresses the matter of reversible error. In *Jacobson*, the court initially noted that the cases that had adopted the reversible-per-se rule had reasoned that the considerations that (1) a confession will " '[a]lmost invariably . . . constitute persuasive evidence of guilt, and [(2)] it is usually extremely difficult to determine what part [the confession] played in securing the conviction[,] . . . justify treating involuntary confessions as a class by themselves and refusing to inquire whether in rare cases their admission in evidence had no bearing on the result.' [Citation]." (*Id.* at p. 330.) The court then went on to declare: "Nevertheless, on this record we do have a 'rare case' *in which a refusal to inquire into the impact, if any, of the confession on the verdict would result in complete abandonment of article VI, section 4½, of the California Constitution.*" (*Ibid.*, italics added.) Because the two invalidly obtained confessions that erroneously had been admitted in *Jacobson* simply were cumulative of the eight valid confessions that also had been introduced at trial, the court in *Jacobson* concluded it was not plausible to suggest that the exclusion of the invalid confessions would have altered the outcome in that case, and, on that basis, held that reversal was not warranted under former article VI, section 4½. *Jacobson*'s reasoning and holding in this regard were followed shortly thereafter in *People* v. *Cotter* (1965) 63 Cal.2d 386, 398 [46 Cal.Rptr. 622, 405 P.2d 862]. (See also *People* v. *Quicke, supra,* 71 Cal.2d 502, 516-518 [applying *Jacobson*].)[16]

---

reversible-per-se rule applied in *Schader, supra,* 62 Cal.2d 716, and its progeny to *voluntary, but improperly admitted, confessions*, there is nothing in *Schader* or any other decision of this court that supports the suggested distinction. This court's past decisions do not indicate that there were two distinct reversible-per-se rules applied to improperly admitted confessions, depending upon whether the confessions were involuntary or voluntary. Rather, as the passage from *Schader* quoted above (see, *ante,* pp. 496-497) makes clear, these decisions explain that the reversible-per-se rule was applied broadly to all improperly admitted confessions, because the rule was based upon the exceptional evidentiary importance of confessions as a class and the recognition that the prejudicial effect on a jury was the same regardless of the reason the confession should have been excluded.

The dissenting opinion of Justice Mosk additionally suggests throughout its analysis that a confession is the substantial equivalent of "an extrajudicial plea of guilty." In our view, this characterization of a confession is plainly untenable. Unlike the entry of a guilty plea, the admission of an extrajudicial confession does not withdraw the issue of guilt or innocence from the trier of fact. When evidence of a confession is admitted at trial, a defendant remains free either to challenge the evidence that indicates he made such a confession, or to rely upon the circumstances surrounding the confession and any other evidence to demonstrate that the confession is not true or at least does not prove all that the prosecution suggests it does. Thus, it is inaccurate to characterize a confession as an extrajudicial plea of guilty.

[16]One Court of Appeal decision has suggested that the multiple-confession exception to the reversible per se rule, established in *Jacobson*, applies only when the erroneously admitted confession is a voluntary confession that, for example, is inadmissible because of a *Miranda* violation (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602,

As noted, the *Jacobson* decision (*supra*, 63 Cal.2d 319) did not purport to question the continued viability of the general reversible-per-se rule applicable to confessions, but simply established an exception to that general rule permitting an appellate court to review the entire trial record in order to determine the prejudicial effect of an erroneously admitted confession when valid as well as invalid confessions had been received at trial. The reasoning underlying the *Jacobson* decision, however, logically cannot be confined to the multiple-confession setting. Although the multiple-confession scenario provides one of the clearest examples of an instance in which it is possible for an appellate court to determine that an erroneously admitted confession did not affect the outcome of the trial, other examples are not difficult to imagine.

The erroneous admission of an involuntary confession properly might be found harmless, for example, (1) when the defendant was apprehended by the police in the course of committing the crime, (2) when there are numerous, disinterested reliable eyewitnesses to the crime whose testimony is confirmed by a wealth of uncontroverted physical evidence, or (3) in a case in which the prosecution introduced, in addition to the confession, a videotape of the commission of the crime (cf. *Fulminante, supra*, 499 U.S. 279, 312-314 [113 L.Ed.2d 302, 333-334, 111 S.Ct. 1246, 1266-1267] (conc. opn. by Kennedy, J.)). As these examples suggest, although in some cases a defendant's confession will be the centerpiece of the prosecution's case in support of a conviction, in many instances it will be possible for an appellate court to determine with confidence that there is no reasonable probability that the exclusion of the confession would have affected the result. We believe that in such cases, as in the multiple-confession setting involved in *Jacobson*, "a refusal to inquire into the impact, if any, of the confession on the verdict would result in complete abandonment of article VI, [section 13], of the California Constitution." (*People* v. *Jacobson, supra*, 63 Cal.2d 319, 330.)

■ Defendant argues, however, that even if it is possible to determine in a particular case that the erroneous admission of an involuntary confession

10 A.L.R.3d 974]), and is inapplicable when a truly involuntary confession has been admitted. (See *People* v. *Hinds* (1984) 154 Cal.App.3d 222, 239-241 [201 Cal.Rptr. 104].) In reaching that conclusion, however, the court in *Hinds* failed adequately to consider either the specific rationale of the *Jacobson* holding—which, as we have seen, rested upon a determination that there was no prejudice under former article VI, section 4½, when an inadmissible confession was merely cumulative of admissible confessions (see *People* v. *Jacobson, supra*, 63 Cal.2d 319, 331)—or the holding and reasoning of the *Schader* decision, which explained that the reversible-per-se rule applied equally to *all* erroneously admitted confessions, both voluntary and involuntary. (See *People* v. *Schader, supra*, 62 Cal.2d 716, 729-731.)

This court never has suggested that the multiple-confession exception recognized in *Jacobson* is inapplicable to involuntary confessions, and other Court of Appeal decisions have applied the exception when the erroneously admitted confession was involuntary. (See, e.g., *People* v. *Nicholas* (1980) 112 Cal.App.3d 249, 266, 268-272 [169 Cal.Rptr. 497].)

did not affect the verdict, the admission of such a confession at trial nonetheless should be viewed as a "miscarriage of justice" warranting automatic reversal under article VI, section 13, in light of the egregious nature of the official misconduct involved in eliciting such a confession. Defendant maintains that abandonment of a reversible-per-se rule in this context would represent a retreat from this state's long-standing condemnation of such improper practices.

We believe defendant's argument suffers from two basic flaws. First, as explained at the outset of this opinion, the category of "involuntary confessions" encompasses a broad spectrum of circumstances, ranging from confessions elicited by violence or threats of violence to the much more common situation in which a confession is obtained as a result of an improper promise of benefit or leniency. Although in all such cases the law enforcement conduct in question is unconstitutional and renders any resulting statement inadmissible at trial, from a realistic perspective the official misconduct involved in obtaining an "involuntary" or "coerced" confession frequently is no more egregious (or even less egregious) than that involved in obtaining evidence by means of unreasonable searches or seizures or other constitutional violations—violations that have not been viewed as requiring the *automatic* reversal of any conviction based upon proceedings in which the fruit of the constitutional transgression has been received. (See, e.g., *People* v. *Parham, supra,* 60 Cal.2d 378, 384-386 [physical evidence unlawfully seized from defendant by use of force].) Furthermore, the category of involuntary confessions with which we are here concerned is, by definition, limited to those confessions that a trial court has found are voluntary and, on that basis, has admitted into evidence. Although the question of prejudice arises, of course, only when an appellate court subsequently holds that the trial court erred in its determination of voluntariness, in most instances the confessions at issue are likely to fall close to the dividing line between voluntary and involuntary confessions. In cases involving the most egregious police conduct, it is likely the confessions either will not be offered into evidence or will be excluded by the trial court.

Second, as we also have seen, the *Jacobson* decision makes it clear that, unlike the former *federal* automatic-reversal rule that was believed justified as a necessary means of deterring illegal police conduct, the California reversible-per-se rule never was grounded on a deterrence rationale. (*People* v. *Jacobson, supra,* 63 Cal.2d 319, 329-330.) Indeed, this court's seminal decision in *People* v. *O'Bryan, supra,* 165 Cal. 55, demonstrates that point quite clearly. As noted previously, the court in *O'Bryan,* although finding that the defendant's statements before the grand jury erroneously had been admitted at his trial (because the statements were not "voluntary," having

been elicited in violation of the defendant's privilege against self-incrimination), did not conclude that automatic reversal was required—or even authorized—under the California reversible-error provision in order to deter such improper law enforcement conduct in the future. Instead, the court in *O'Bryan* examined the improperly admitted statements in the context of the entire trial record and, on that basis, concluded that the constitutional error was not prejudicial and did not warrant reversal.

The point is further demonstrated by the line of California decisions holding that the introduction of an involuntary *admission* (as distinguished from a *confession*) is *not* reversible per se, no matter how flagrant the misconduct in obtaining the admission, but rather is subject to ordinary harmless-error analysis. (See, e.g., *People* v. *Hillery* (1965) 62 Cal.2d 692, 712 [44 Cal.Rptr. 30, 401 P.2d 382].) Were automatic reversal justified under the California Constitution as a means of deterring coercive police conduct, a reversible-per-se rule logically would apply to the introduction of an unconstitutionally elicited admission as well as to the introduction of an involuntary confession. Accordingly, it is clear that, under established California principles, a reversible-per-se rule is not justified on a deterrence rationale. (See also *People* v. *Stroble, supra,* 36 Cal.2d 615, 617-618.)

Defendant further suggests that a rule requiring automatic reversal is warranted in the case of coerced or involuntary confessions, as distinguished from other categories of inadmissible evidence, because of the unreliability of such confessions. It is now well established, however, that a confession properly may be classified as an involuntary or coerced confession without regard to its reliability (see, e.g., *People* v. *Ditson* (1962) 57 Cal.2d 415, 437-439 [20 Cal.Rptr. 165, 369 P.2d 714]), and in many instances there may be corroborating evidence that demonstrates that such a confession, although inadmissible because obtained by unconstitutional means, is in fact reliable. Furthermore, even though in numerous circumstances there may be good reason to question the reliability of a confession improperly obtained by police coercion (see, e.g., *People* v. *Hogan* (1982) 31 Cal.3d 815, 834-844 [183 Cal.Rptr. 817, 647 P.2d 93]), a defendant may, of course, rely upon the evidence of such coercion to challenge the truth of the confession at trial, and an appellate court, in determining whether the erroneous admission of a confession warrants reversal, can and will take into account the circumstances leading to the confession and the risk that the confession may be unreliable, as it examines the entire record under a traditional prejudicial-error analysis. Accordingly, the potential unreliability of an involuntary confession does not support the application of a reversible-per-se rule under the California Constitution.

Finally, defendant argues that even if this court now is of the view that application of a reversible-per-se rule to the admission of coerced confessions is not warranted under article VI, section 13, of the California Constitution, such a rule nonetheless should be retained as a matter of stare decisis. Emphasizing that such a rule has been applied in numerous California decisions for the past 35 years, defendant argues that there is no reason to alter the rule at the present time.

For a number of reasons, we do not believe that principles of stare decisis should be conclusive as to the issue at hand. First, although the reversible-per-se rule has been applied in California decisions since 1958, for virtually all of the period in question—until the United States Supreme Court's 1991 decision in *Fulminante, supra,* 499 U.S. 279—a reversible-per-se rule applicable to coerced confessions was understood to be mandated by the federal Constitution, and during that time there has been no reason for our court to scrutinize closely the validity of the rule as a matter of state law.

Second, as we have seen, for the major portion of the period following California's adoption of the constitutional reversible-error provision in 1911—i.e., from 1911 until 1958—California decisions applied the ordinary prejudicial-error analysis mandated by that provision to the erroneous admission of coerced confessions. In adopting and applying a different state rule beginning in the late 1950's and mid-1960's, the California decisions did not discuss the prior California case law or attempt to explain how a rule requiring automatic reversal for such error was compatible with the purpose of the applicable state constitutional provision.

Third, as we also have explained, the 1965 decision in *Jacobson (People* v. *Jacobson, supra,* 63 Cal.2d 319), in fashioning an exception to the reversible-per-se rule for cases involving multiple confessions, implicitly revealed the fundamental incompatibility of a reversible-per-se rule with the basic premise of the governing state constitutional provision. The existence and rationale of the long-standing *Jacobson* exception diminishes the force of defendant's stare decisis claim.

Finally, we believe that retention of a reversible-per-se rule, solely on the basis of stare decisis, would fail to give proper recognition to the important public policies underlying the reversible error provision set forth in California's Constitution—policies that remain of vital significance today. As the proponents of the 1911 measure recognized, an overly broad rule of reversible error that *compels* the reversal of judgments rendered in fairly tried criminal proceedings on the basis of errors that are unlikely to have affected

the outcome, often will have the detrimental effect of eroding the public's confidence in the criminal justice system. (See Proposed Amends. to the Const. of the State of Cal. with Legis. Reasons for and Against the Adoption Thereof (Special Statewide Elec. of Oct. 10, 1911), Sen. Const. Amend. No. 26, statements by Sens. Boynton & Birdsall.) When a defendant has received a fair trial, and a review of the record reveals that, although some evidence improperly was admitted at trial, there also was an overwhelming amount of additional, properly admitted evidence clearly establishing the defendant's guilt, reversal of the judgment will result either in a superfluous retrial in which the outcome is a foregone conclusion or, even more unfortunately, in a new trial whose result is altered by the loss of essential witnesses or testimony through the passage of time. In either event, public confidence in the operation of the criminal justice system is diminished.

Furthermore, an overly broad reversible-error rule, mandating reversal even in circumstances in which it is clear the error did not affect the judgment, may in practice operate to weaken or diminish the basic constitutional right that is sought to be protected by the rule. As then-Justice Traynor explained for this court in *People* v. *Parham, supra,* 60 Cal.2d 378, 386, in rejecting the adoption of a reversible-per-se rule with regard to the erroneous admission of evidence obtained as a result of an unconstitutional search or seizure: "A reversal for the admission of illegally obtained evidence without regard for prejudice when there is compelling legally obtained evidence of guilt constitutes nothing more than a penalty, not for the officer's illegal conduct in securing the evidence, but solely for the prosecutor's blunder in offering it and the trial court's error in admitting it. To require automatic reversal for such harmless error could not help but to generate pressure to find that the [improper] police conduct was lawful after all and thereby to undermine constitutional standards of police conduct to avoid needless retrial. [Citations.] An exclusionary rule so rigidly administered could thereby defeat itself." In our view, this reasoning applies equally in the context of coerced confessions, and affords an additional persuasive basis for us to decline to perpetuate the application of a reversible-per-se rule in the present setting.

 Accordingly, for the reasons discussed above, we overrule the line of California decisions holding that the erroneous admission of a coerced confession is reversible per se under California law.[17] The prejudicial effect of such error is to be determined, for purposes of California law, under the

---

[17]The following decisions are overruled to the extent they hold or indicate that the erroneous admission of a confession is reversible per se under California law: *People* v. *Berve, supra,* 51 Cal.2d 286, 290; *People* v. *Trout, supra,* 54 Cal.2d 576, 585; *People* v. *Brommel, supra,* 56 Cal.2d 629, 634; *People* v. *Matteson, supra,* 61 Cal.2d 466, 469-470;

generally applicable reasonable-probability test embodied in article VI, section 13, of the California Constitution. (*People* v. *Watson, supra,* 46 Cal.2d 818, 836.) Of course, because the *Watson* standard is less demanding than the harmless-beyond-a-reasonable-doubt standard mandated by the applicable federal constitutional authorities (see *Arizona* v. *Fulminante, supra,* 499 U.S. 279, 306-312 [113 L.Ed.2d 302, 329-333, 111 S.Ct. 1246, 1263-1266]; *Chapman* v. *California, supra,* 386 U.S. 18, 23 [17 L.Ed.2d 705, 710]), whenever a confession admitted in a California trial has been obtained by means that render the confession inadmissible under the federal Constitution, the prejudicial effect of the confession must be determined under the federal standard.

## VIII

As discussed above, the Court of Appeal in the present case did not attempt to evaluate the prejudicial effect of defendant's involuntary confession in light of the other evidence received at trial, but rather followed the line of prior California decisions in concluding that the erroneous admission of such a confession required automatic reversal of defendant's murder-related convictions. Because we have overruled the line of decisions upon which the Court of Appeal relied, we consider it appropriate to remand this matter to the Court of Appeal to permit that court to determine the question of prejudice under the principles established herein. If the Court of Appeal determines, from its evaluation of the entire record, that the admission of defendant's confession does not compel reversal, it should proceed to address the additional claims of error raised on this appeal.

## IX

To avoid any misunderstanding as to the nature or scope of our decision in this case, we add a few brief concluding remarks.

Nothing in this opinion should be misinterpreted to suggest that California law permits or tolerates the coercion of a confession from a suspect in a criminal case. The California Constitution clearly provides that persons may not "be compelled in a criminal cause to be a witness against themselves" (Cal. Const., art. I, § 15), and coercive conduct by any law enforcement officer that results in an involuntary confession is unquestionably intolerable and unconstitutional. An individual who is subjected to such unconstitutional

*People* v. *Dorado, supra,* 62 Cal.2d 338, 356-357; *People* v. *Schader, supra,* 62 Cal.2d 716, 728-731; *People* v. *Sears, supra,* 62 Cal.2d 737, 743; *People* v. *Fioritto, supra,* 68 Cal.2d 714, 720; *People* v. *Randall, supra,* 1 Cal.3d 948, 958; *People* v. *McClary, supra,* 20 Cal.3d 218, 230; and *People* v. *Jimenez, supra,* 21 Cal.3d 595, 605-606.

conduct may invoke a variety of remedies (see, e.g., *Cooper v. Dupnik* (9th Cir. 1992) 963 F.2d 1220 [civil rights action for damages]), and a law enforcement officer who engages in such conduct may be subjected to severe administrative discipline and even criminal prosecution. Furthermore, the rule remains clear that when a trial court finds a confession has been obtained by improper means that render it "involuntary" or "coerced," the confession must be excluded from evidence at trial.

The issue we decide today thus does not turn on the question whether the California Constitution condones the obtaining of coerced confessions; it is plain that our state Constitution emphatically prohibits such conduct. The question before us involves a different and much narrower issue: namely whether, when an appellate court determines that a trial court has erred in finding that a defendant's confession is voluntary and concludes that the confession should not have been admitted in evidence at a defendant's trial, California law requires that the appellate court *automatically* reverse the defendant's conviction without regard to the nature and strength of the other evidence of guilt introduced at the trial, or instead requires that the appellate court consider *all* the evidence properly admitted at trial in determining whether reversal is warranted. As we have explained, in view of the language and history of the specific provision of the California Constitution governing the question of reversible error (Cal. Const., art. VI, § 13), we conclude that a rule of automatic reversal is not warranted under California law.

The judgment of the Court of Appeal is reversed insofar as it holds that the erroneous admission of defendant's involuntary confession automatically required reversal of his murder-related convictions, and the matter is remanded to the Court of Appeal for further proceedings consistent with the views expressed in this opinion.

Lucas, C. J., Panelli, J., Arabian, J., and Baxter, J., concurred.

**MOSK, J.**—I dissent.

It has been said that fundamental truth is the first casualty of war. Now a fundamental principle of justice has become a casualty of the synthetic war on crime.

Contrary to the conclusion of the majority opinion, there is no reason to abandon or even reconsider the well- and long-settled California rule that, in a criminal trial, the admission into evidence of what has variously been called a "coerced" or "involuntary" confession by the defendant requires automatic reversal of any ensuing judgment of conviction. Certainly, the handing down by the United States Supreme Court of its decision in *Arizona*

v. *Fulminante* (1991) 499 U.S. 279 [113 L.Ed.2d 302, 111 S.Ct. 1246] (hereafter sometimes *Fulminante*), which purportedly abrogates the analogous federal constitutional rule, does not provide us with an "appropriate opportunity" (maj. opn., *ante*, at p. 500) to address the question.[1]

The significance of the majority opinion must not be overlooked. To be sure, it will not send us back to the Inquisition and the Star Chamber straightaway. It assures us, somewhat ominously, that "we have no occasion *in this case* to decide whether" coerced confessions remain inadmissible under the California Constitution. (Maj. opn., *ante*, at pp. 485-486, italics added.) But it will definitely cause us to take the first step in that direction. (Cf. *Arizona* v. *Fulminante, supra,* 499 U.S. at pp. 294-295 [113 L.Ed.2d at pp. 321-322, 111 S.Ct. at p. 1257] (dis. opn. of White, J.) [treating the purported abrogation of the federal constitutional rule of automatic reversal for the admission of a coerced confession as the abolition of the related rule barring the admission of such a confession in the first place].) I refuse to set out on such a dark journey.

## I. COERCED CONFESSIONS AND ERROR

Let us proceed from what is, and must be, common ground.

### A. *The United States Constitution*

It is error under the United States Constitution to admit a defendant's coerced confession into evidence at a criminal trial.

The Fifth Amendment establishes a privilege against self-incrimination: "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." The constitutional provision has remained unchanged since its ratification in 1791.

In *Bram* v. *United States* (1897) 168 U.S. 532, 542 [42 L.Ed. 568, 573, 18 S.Ct. 183] (hereafter sometimes *Bram*), the United States Supreme Court expressly concluded that "[i]n criminal trials, in the courts of the United States, wherever a question arises whether a confession is incompetent because not voluntary, the issue is controlled by that portion of the Fifth Amendment to the Constitution of the United States, commanding that no

---

[1] It must be emphasized that the issue presented in this matter concerns our rule of automatic reversal for the admission of a coerced confession. It does *not* relate to a rule that is derived therefrom, but broader in scope, to the effect that the "introduction of a confession obtained from a defendant in violation of [federal] constitutional guarantees is prejudicial per se and requires reversal regardless of other evidence of guilt." (*People* v. *Fioritto* (1968) 68 Cal.2d 714, 720 [68 Cal.Rptr. 817, 441 P.2d 625].)

person 'shall be compelled in any criminal case to be a witness against himself.' "

In addition, the *Bram* court impliedly concluded that the Fifth Amendment's privilege against self-incrimination extends its reach beyond the criminal courtroom and operates even in the absence of "compulsion" commonly so called. (See *Bram* v. *United States, supra,* 168 U.S. at pp. 542-561 [42 L.Ed. at pp. 573-580].)

Thus, at one point the *Bram* court stated: " 'But a confession, in order to be admissible, must be free and voluntary: that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. . . . A confession can never be received in evidence where the prisoner has been influenced by any threat or promise; for the law cannot measure the force of the influence used, or decide upon its effect upon the mind of the prisoner, and therefore excludes the declaration if any degree of influence has been exerted.' " (*Bram* v. *United States, supra,* 168 U.S. at pp. 542-543 [42 L.Ed. at pp. 573-574], ellipsis in original, quoting 3 Russell on Crimes (6th ed.) p. 478.)

At another point, the *Bram* court stated: "The rule is not that in order to render a statement admissible the proof must be adequate to establish that the particular communications contained in a statement were voluntarily made, but it must be sufficient to establish that the making of the statement was voluntary; that is to say, that from the causes, which the law treats as legally sufficient to engender in the mind of the accused hope or fear in respect to the crime charged, the accused was not involuntarily impelled to make a statement, when but for the improper influences he would have remained silent." (*Bram* v. *United States, supra,* 168 U.S. at p. 549 [42 L.Ed. at pp. 575-576].)

The conclusions reached in *Bram* remain good law. Indeed, they were explicitly reaffirmed by the United States Supreme Court in *Miranda* v. *Arizona* (1966) 384 U.S. 436, 460-462 [16 L.Ed.2d 694, 715-717, 86 S.Ct. 1602, 10 A.L.R.3d 974].[2]

The Fifth Amendment's privilege against self-incrimination is available against the individual states as well as the United States itself. (See, e.g.,

---

[2]From time to time, the accuracy of the historical exposition that the *Bram* court set out in support of its conclusions has been assailed. (See McCormick, *The Scope of Privilege in the Law of Evidence* (1938) 16 Tex. L.Rev. 447, 453; 3 Wigmore, Evidence (3d ed. 1940) § 823, p. 250, fn. 5; *Developments in the Law—Confessions* (1966) 79 Harv. L.Rev. 935, 960 [following McCormick and Wigmore]; *Miranda* v. *Arizona, supra,* 384 U.S. at p. 506, fn. 2 [16 L.Ed.2d at pp. 741-742] (dis. opn. of Harlan, J.) [same].) After *Miranda,* however, the

*Miranda* v. *Arizona, supra,* 384 U.S. at pp. 458-464 [16 L.Ed.2d at pp. 714-718].) In *Barron* v. *Baltimore* (1833) 32 U.S. (7 Pet.) 243, 247-250 [8 L.Ed. 672, 674-675], which was decided before the adoption of the Fourteenth Amendment, the United States Supreme Court held that the Fifth Amendment applied to the federal government alone. In *Twining* v. *New Jersey* (1908) 211 U.S. 78, 99-114 [53 L.Ed. 97, 106-112, 29 S.Ct. 14], and *Adamson* v. *California* (1947) 332 U.S. 46, 53-54 [91 L.Ed. 1903, 1909-1910, 67 S.Ct. 1672, 171 A.L.R. 1223], the court concluded that the federal constitutional privilege was not made applicable to the states through the due process clause of the Fourteenth Amendment. In *Malloy* v. *Hogan* (1964) 378 U.S. 1, 3-8 [12 L.Ed.2d 653, 656-660, 84 S.Ct. 1489] (hereafter sometimes *Malloy*), however, the court held to the contrary.

## B. *The California Constitution*

Separately and independently, it is error under the California Constitution to admit a defendant's coerced confession into evidence at a criminal trial. Section 15 of article I of the state charter establishes its own privilege against self-incrimination: "Persons may not . . . be compelled in a criminal cause to be a witness against themselves . . . ." This provision derives from former section 13 of article I of the currently effective Constitution of 1879: "No person shall . . . be compelled, in any criminal case, to be a witness against himself . . . ." That provision, in turn, was taken from section 8 of article I of the original, and now superseded, Constitution of 1849: "No person . . . shall . . . be compelled, in any criminal case, to be a witness against himself . . . ." For present purposes, the state constitutional privilege is much the same as the federal. (See, e.g., *People* v. *Loper* (1910) 159 Cal. 6, 17-20 [112 P. 720].)

## C. *Underlying Policies*

Informing the federal and state constitutional privileges against self-incrimination and the related rules barring the admission of a coerced confession are diverse values and purposes.

In Anglo-American law generally, many "policies . . . have been advanced as . . . justification" for the privilege against self-incrimination. (8

---

assault is without doctrinal significance. (See 3 Wigmore, Evidence (Chadbourn rev. 1970) § 823, p. 340 [hereafter 3 Wigmore].)

It should be noted that *Bram*'s language that a confession may not be " 'obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence' " (*Bram* v. *United States, supra,* 168 U.S. at pp. 542-543 [42 L.Ed. at pp. 573-574]) "under current precedent does not state the standard for determining the voluntariness of a confession" for relevant federal constitutional purposes. (*Arizona* v. *Fulminante, supra,* 499 U.S. at p. 285 [113 L.Ed.2d at pp. 314-315, 111 S.Ct. at p. 1251] (opn. of White, J.).)

Wigmore, Evidence (McNaughton rev. 1961) § 2251, p. 297 [hereafter 8 Wigmore]; accord, *People* v. *Coleman* (1975) 13 Cal.3d 867, 875 [120 Cal.Rptr. 384, 533 P.2d 1024]; see *Murphy* v. *Waterfront Comm'n* (1964) 378 U.S. 52, 55 [12 L.Ed.2d 678, 681-682, 84 S.Ct. 1594] [hereafter sometimes *Murphy*]; see generally 8 Wigmore, *supra*, § 2251, pp. 295-318; 1 McCormick, Evidence (4th ed. 1992) § 118, pp. 430-435 [hereafter 1 McCormick].) Some are real, others only apparent; some implicate themselves in many situations, others only in a few; some are basic, others merely derivative. (See generally 8 Wigmore, *supra*, § 2251, pp. 295-318; 1 McCormick, *supra*, § 118, pp. 430-435.)

Among these policies, three are worthy of note in the present matter.

One is the prevention of overreaching by the government and the consequent mistreatment of the individual, whether by physical torture or psychological pressure, by blatant measures or subtle devices (see 8 Wigmore, *supra*, § 2251, pp. 315-316; 1 McCormick, *supra*, § 118, p. 433)—put otherwise, the avoidance of a "recurrence of the Inquisition and the Star Chamber, even if not in their stark brutality" (*Ullmann* v. *United States* (1956) 350 U.S. 422, 428 [100 L.Ed. 511, 519, 76 S.Ct. 497, 53 A.L.R.2d 1008]; accord, *Board of Education* v. *Mass* (1956) 47 Cal.2d 494, 503 [304 P.2d 1015] (conc. opn. of Carter, J.)).[3]

Another policy is the exclusion of evidence that is regarded as inherently unreliable, i.e., the "self-incriminating admissions of the accused" (1 McCormick, *supra*, § 118, p. 432), in accordance with what has been described as "our distrust of self-deprecatory statements" (*Murphy* v. *Waterfront Comm'n*, *supra*, 378 U.S. at p. 55 [12 L.Ed.2d at pp. 681-682]; accord, *People* v. *Jimenez* (1978) 21 Cal.3d 595, 605 [147 Cal.Rptr. 172, 580 P.2d 672]).

But the policy that is the most substantial, expansive, and fundamental is this: "The privilege contributes toward a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load." (8 Wigmore, *supra*, § 2251, p. 317.) For it is the "prevailing ethic that the individual is sovereign and that proper rules of battle between government and individual require that the individual not be bothered for less than good reason and not be conscripted by his opponent to defeat himself . . . ." (*Id.*, § 2251, p. 318.)

---

[3]The majority declare that the "situation in which a confession is obtained as a result of an improper promise of benefit or leniency" is "much more common" than that in which a confession is "elicited by violence or threats of violence . . . ." (Maj. opn., *ante*, at p. 506.) This factual assertion is unsupported. I hope it is true. I fear it is not.

The United States Supreme Court has recognized the point as to the federal constitutional privilege against self-incrimination.

Thus, in *Murphy* v. *Waterfront Comm'n, supra*, 378 U.S. 52, the court declared at page 55 [12 L.Ed.2d at pages 681-682]: "The privilege against self-incrimination 'registers an important advance in the development of our liberty—"one of the great landmarks in man's struggle to make himself civilized." ' [Citation.] It reflects many of our fundamental values and most noble aspirations," including "our preference for an accusatorial rather than an inquisitorial system of criminal justice" and "our sense of fair play which dictates 'a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load[.]' " (Fn. omitted.)

In *Malloy* v. *Hogan, supra*, 378 U.S. 1, the court observed at pages 7 to 8 [12 L.Ed.2d at pages 658-659]: "[T]he American system of criminal prosecution is accusatorial, not inquisitorial, and . . . the Fifth Amendment privilege is its essential mainstay. [Citation.] Governments, state and federal, are thus constitutionally compelled to establish guilt by evidence independently and freely secured, and may not by coercion prove a charge against an accused out of his own mouth."

And in *Miranda* v. *Arizona, supra*, 384 U.S. 436, the court elaborated at page 460 [16 L.Ed.2d at page 715]: "[T]he constitutional foundation underlying the privilege is the respect a government—state or federal—must accord to the dignity and integrity of its citizens. To maintain a 'fair state-individual balance,' to require the government 'to shoulder the entire load,' [citation], to respect the inviolability of the human personality, our accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth."

We have recognized the same point as to the state constitutional privilege against self-incrimination. Our discussion in such decisions as *People* v. *Jimenez, supra*, 21 Cal.3d 595, and *People* v. *Schader* (1969) 71 Cal.2d 761 [80 Cal.Rptr. 1, 457 P.2d 841], furnishes proof. In both cases, we effectively construed the guaranty of the state charter as the court in *Murphy* and *Malloy* had construed the guaranty of the federal. (See *People* v. *Jimenez, supra*, 21 Cal.3d at p. 605; *People* v. *Schader, supra*, 71 Cal.2d at pp. 769-770.)

Underlying the federal and state constitutional rules barring the admission of a coerced confession are policies that correspond—unsurprisingly—to

those of the federal and state constitutional privileges against self-incrimination. .

Accordingly, one of these policies is the prevention of governmental overreaching. (See e.g., 1 LaFave & Israel, Criminal Procedure (1984) § 6.2(b), pp. 442-443 [hereafter LaFave & Israel] [discussing the federal constitutional rule]; *Miller* v. *Fenton* (1985) 474 U.S. 104, 109 [88 L.Ed.2d 405, 410, 106 S.Ct. 445] [same; implying, in words quoted from *Brown* v. *Mississippi* (1936) 297 U.S. 278, 286 [80 L.Ed. 682, 687], that the rule's purpose is to deter official conduct that is " 'revolting to the sense of justice' "]; *People* v. *Atchley* (1959) 53 Cal.2d 160, 170 [346 P.2d 764] [stating generally that coerced confessions are excluded "because," among other reasons, "exclusion serves to discourage the use of physical brutality and other undue pressures in questioning those suspected of crime"].)

Another policy is the exclusion of evidence deemed unreliable. (See, e.g., 1 LaFave & Israel, *supra,* § 6.2(b), pp. 442, 444 [discussing the federal constitutional rule]; *People* v. *Atchley, supra,* 53 Cal.2d at p. 170 [stating generally that coerced confessions are excluded "because," among other reasons, "they are untrustworthy"].)[4]

The most basic of the policies, however, is simply the ensuring of fairness in the contest between the government and the individual. (See, e.g., *Colorado* v. *Connelly, supra,* 479 U.S. at p. 167 [93 L.Ed.2d at pp. 484-485] [discussing the federal constitutional rule; stating, in words quoted from *Lisenba* v. *California* (1941) 314 U.S. 219, 236 [86 L.Ed. 166, 179-180, 62 S.Ct. 280], that " '[t]he aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the [government's] use of evidence [against the individual], whether true or false[ ]' "]; *People* v. *Atchley, supra,* 53 Cal.2d at p. 170 [stating generally that coerced confessions are excluded "because," among other reasons, "it offends 'the community's sense of fair play and decency' to convict a defendant by evidence extorted from him"].)

It goes without saying that the "fairness" policy that underlies both the federal and state constitutional privileges against self-incrimination and the

---

[4]It has been asserted that in *Colorado* v. *Connelly* (1986) 479 U.S. 157 [93 L.Ed.2d 473, 107 S.Ct. 515], the United States Supreme Court departed from the reliability policy for purposes of the federal constitutional rule. (1 McCormick, *supra,* § 147, p. 568.) That is not the case. The *Connelly* court held only that the rule requires a confession that is coerced *by the government,* and is not satisfied by a statement that is merely unreliable. (*Colorado* v. *Connelly, supra,* 479 U.S. at pp. 163-167 [93 L.Ed.2d at pp. 481-485]; cf. *People* v. *Benson* (1990) 52 Cal.3d 754, 778 [276 Cal.Rptr. 827, 802 P.2d 330] [holding in substance that the state constitutional rule incorporates the same requirement].)

related rules barring the admission of a coerced confession does *not* seek to further the ascertainment of the truth in criminal proceedings. (See, e.g., *Tehan* v. *Shott* (1966) 382 U.S. 406, 416 [15 L.Ed.2d 453, 459-460, 86 S.Ct. 459] [stating that the federal constitutional privilege "is not an adjunct to the ascertainment of truth"].) Nor is this policy merely neutral in this regard. Rather, it serves in fact to frustrate efforts to attain the goal. (See, e.g., *Baxter* v. *Palmigiano* (1976) 425 U.S. 308, 319 [47 L.Ed.2d 810, 821-822, 96 S.Ct. 1551] [stating that the federal constitutional privilege "derogates rather than improves the chances for accurate decisions"].) What it aims to promote, as the discussion above suggests, is not the reliability of the outcome of an individual criminal trial, but the legitimacy of the criminal justice system itself.

In view of the foregoing, it is plain that the admission, at a federal criminal trial, of a coerced confession offensive to the Fifth Amendment's privilege against self-incrimination constitutes a denial of due process of law under that same amendment. (See *Miranda* v. *Arizona, supra*, 384 U.S. at p. 503 [16 L.Ed.2d at p. 740] (conc. & dis. opn. of Clark, J.).) Similarly, the admission, at a state criminal trial, of a confession of this sort denies due process under the Fourteenth Amendment. (See, e.g., *Payne* v. *Arkansas* (1958) 356 U.S. 560, 568 [2 L.Ed.2d 975, 981, 78 S.Ct. 844] [hereafter sometimes *Payne*].) In California, the admission of a coerced confession offensive to the federal and/or state constitutional privilege also denies due process under sections 7 and 15 of article I of the state charter. (See, e.g., *People* v. *Benson, supra*, 52 Cal.3d at p. 778.)

## II. COERCED CONFESSIONS AND REVERSAL

From the fact that it is error under both the United States and California Constitutions to admit a defendant's coerced confession into evidence at a criminal trial, let us now turn to the question of the consequences of such error.

### A. *The United States Constitution*

It is the rule under the United States Constitution—*Fulminante* put to the side for the time being—that the admission of a defendant's coerced confession into evidence at a criminal trial requires automatic reversal. (See, e.g., *Rose* v. *Clark* (1986) 478 U.S. 570, 578, fn. 6 [92 L.Ed.2d 460, 470-471, 106 S.Ct. 3101] [hereafter sometimes *Clark*]; *United States* v. *Hasting* (1983) 461 U.S. 499, 508, fn. 6 [76 L.Ed.2d 96, 105-106, 103 S.Ct. 1974]; *New Jersey* v. *Portash* (1979) 440 U.S. 450, 459 [59 L.Ed.2d 501, 510, 99 S.Ct. 1292]; *Mincey* v. *Arizona* (1978) 437 U.S. 385, 398 [57 L.Ed.2d 290, 303-304, 98

S.Ct. 2408]; *Lego* v. *Twomey* (1972) 404 U.S. 477, 483 [30 L.Ed.2d 618, 623-624, 92 S.Ct. 619]; *Chapman* v. *California* (1967) 386 U.S. 18, 23 & fn. 8 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065] [hereafter sometimes *Chapman*]; *Jackson* v. *Denno* (1964) 378 U.S. 368, 376 [12 L.Ed.2d 908, 915, 84 S.Ct. 1774, 1 A.L.R.3d 1205]; *Haynes* v. *Washington* (1963) 373 U.S. 503, 518 [10 L.Ed.2d 513, 523-524, 83 S.Ct. 1336]; *Lynumn* v. *Illinois* (1963) 372 U.S. 528, 537 [9 L.Ed.2d 922, 928, 83 S.Ct. 917]; *Blackburn* v. *Alabama* (1960) 361 U.S. 199, 206, 211 [4 L.Ed.2d 242, 247-248, 250-251, 80 S.Ct. 274]; *Spano* v. *New York* (1959) 360 U.S. 315, 324 [3 L.Ed.2d 1265, 1272, 79 S.Ct. 1202]; *Payne* v. *Arkansas, supra,* 356 U.S. at p. 568 [2 L.Ed.2d at p. 981]; *Brown* v. *Allen* (1953) 344 U.S. 443, 475 [97 L.Ed.2d 469, 498-499, 93 S.Ct. 397]; *Stroble* v. *California* (1952) 343 U.S. 181, 190 [96 L.Ed. 872, 880-881, 72 S.Ct. 599]; *Gallegos* v. *Nebraska* (1951) 342 U.S. 55, 63 [96 L.Ed. 86, 93, 72 S.Ct. 141]; *Haley* v. *Ohio* (1948) 332 U.S. 596, 599 [92 L.Ed. 224, 228, 68 S.Ct. 302]; *Malinski* v. *New York* (1945) 324 U.S. 401, 404 [89 L.Ed. 1029, 1032, 65 S.Ct. 781]; *Lyons* v. *Oklahoma* (1944) 322 U.S. 596, 597, fn. 1 [88 L.Ed. 1481, 1483, 64 S.Ct. 1208]; *Wan* v. *United States* (1924) 266 U.S. 1, 17 [69 L.Ed. 131, 149, 45 S.Ct. 1]; *Bram* v. *United States, supra,* 168 U.S. at p. 541 [42 L.Ed. at p. 573].)

The rationale of the rule is easy to discern. It is bottomed on the policy of fairness in the contest between the government and the individual, which underlies the Fifth Amendment's privilege against self-incrimination and the related rule barring the admission of a coerced confession.

Stated more expansively, the rationale is to this effect: "The harm caused by the violation—the skewed balance between the state and the accused—[can] be cured [only] by a new trial at which the confession and its fruits are excluded. Because the value in fair play is not concerned with reliability, the conviction [must] be reversed and [the] process redone even when the defendant is undeniably guilty and we are fully confident that the confession did not affect the jury's verdict." (Stacy & Dayton, *Rethinking Harmless Constitutional Error* (1988) 88 Colum. L.Rev. 79, 104 [hereafter Stacy & Dayton].)

The rule of automatic reversal does not overlook the fact that a confession, when introduced at trial, constitutes evidence. But it recognizes that such evidence is sui generis. "A plea of guilty is in essence a confession in open court . . . ." (*In re Tahl* (1969) 1 Cal.3d 122, 135, fn. 11 [81 Cal.Rptr. 577, 460 P.2d 449].) Similarly, a confession is substantially an extrajudicial plea of guilty. A coerced guilty plea cannot support a conviction: the former renders the latter a denial of due process. (See, e.g., *Waley* v. *Johnston*

(1942) 316 U.S. 101, 104 [86 L.Ed. 1302, 1304, 62 S.Ct. 964].) It follows that a coerced confession cannot support a conviction for the same reason. (*Ibid.*)

The rule, it must be emphasized, does not at all depend on considerations of reliability. In *Jackson* v. *Denno, supra,* 378 U.S. 368, the United States Supreme Court declared at page 376 [12 L.Ed.2d at page 915]: "It is . . . axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession [citation], and even though there is ample evidence aside from the confession to support the conviction."

Associated with the "fairness" rationale is a more practical concern regarding the evidentiary force that inheres in confessions as such, which has compelled the recognition that "where . . . a coerced confession constitutes a part of the evidence before the jury . . . , no one can say what credit and weight the jury gave to the confession." (*Payne* v. *Arkansas, supra,* 356 U.S. at p. 568 [2 L.Ed.2d at p. 981].)

Manifestly, the rule of automatic reversal dates back almost a century to *Bram.* (See *Bram* v. *United States, supra,* 168 U.S. at p. 541 [42 L.Ed. at p. 573].) There, the court flatly held that if a defendant's coerced confession is admitted, "reversible error *will* result . . . ." (*Ibid.,* italics added.) This holding cannot be treated as merely an instance of some "general assumption" that all federal constitutional errors are reversible per se. Barely two terms later, in *Motes* v. *United States* (1900) 178 U.S. 458, 475-476 [44 L.Ed. 1150, 1156, 20 S.Ct. 993], the court expressly held harmless the admission of evidence in violation of a defendant's Sixth Amendment right of confrontation. Since *Bram,* as the citations in the initial paragraph of this section indicate, the rule has been firmly adhered to and reaffirmed time and again.

The rule of automatic reversal arose in a period in which it was assertedly "unclear" whether and to what extent federal constitutional errors are subject to harmless-error analysis. (Stacy & Dayton, *supra,* 88 Colum. L.Rev. at pp. 82-83; compare *Kotteakos* v. *United States* (1946) 328 U.S. 750, 764-765 [90 L.Ed. 1557, 1556-1567, 66 S.Ct. 1239] [stating in dictum that an error may be held harmless "except perhaps where the departure is from a constitutional norm"] with *Motes* v. *United States, supra,* 178 U.S. at pp. 475-476 [44 L.Ed. at p. 1156] [holding harmless the admission of evidence in violation of a defendant's Sixth Amendment right of confrontation].)

In 1967, that period ended. In *Chapman* v. *California, supra,* 386 U.S. 18, the United States Supreme Court held that federal constitutional errors are,

indeed, subject to harmless-error analysis. (*Id.* at pp. 21-22 [17 L.Ed.2d at pp. 708-710].) In the court's words: "[T]here may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." (*Id.* at p. 22 [17 L.Ed.2d at pp. 709-710].) The standard is strict: "[B]efore a federal constitutional error" that is not automatically reversible "can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (*Id.* at p. 24 [17 L.Ed.2d at pp. 710-711].)

The *Chapman* court, however, expressly excepted from harmless-error analysis the admission of a coerced confession. Again in the court's own words: "[O]ur prior cases have indicated that there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error . . . ." (*Chapman* v. *California, supra,* 386 U.S. at p. 23 [17 L.Ed.2d at p. 710].) The court cited to *Payne* as one of those decisions, and to the introduction of a coerced confession as one of those errors. (*Id.* at p. 23, fn. 8 [17 L.Ed.2d at p. 710].) *Payne* had held that, no matter what the other evidence, the "admission in evidence . . . of [a] coerced confession vitiates the judgment because it violates the Due Process Clause of the Fourteenth Amendment." (*Payne* v. *Arkansas, supra,* 356 U.S. at p. 568 [2 L.Ed.2d at p. 981].)

In 1986, the United States Supreme Court revisited the question of harmless error. In *Rose* v. *Clark, supra,* 478 U.S. 570, the court concluded that federal constitutional errors are generally subject to harmless-error analysis. (*Id.* at pp. 576-579 [92 L.Ed.2d at pp. 469-471].) It explained: " 'The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence [citation], and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.' " (*Id.* at p. 577 [92 L.Ed.2d at p. 470], quoting *Delaware* v. *Van Arsdall* (1986) 475 U.S. 673, 681 [89 L.Ed.2d 674, 684-685, 106 S.Ct. 1431].)

All the same, the *Clark* court continued to expressly except from harmless-error analysis the admission of a coerced confession. (*Rose* v. *Clark, supra,* 478 U.S. at pp. 577-578 & fn. 6 [92 L.Ed.2d at pp. 470-471].) It did so because "some errors necessarily render a trial fundamentally unfair. The State of course must provide a trial before an impartial judge [citation], with counsel to help the accused defend against the State's charge [citation]. . . . Without these basic protections, a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence [citation],

and no criminal punishment may be regarded as fundamentally fair. Harmless-error analysis thus presupposes a trial, at which the defendant, represented by counsel, may present evidence and argument before an impartial judge and jury." (*Id.* at pp. 577-578 [92 L.Ed.2d at pp. 470-471].) In the court's view, the "use of [a] coerced confession" "abort[s] the basic trial process . . . ." (*Id.* at p. 578, fn. 6 [92 L.Ed.2d at pp. 470-471].) It does so, of course, because a confession is substantially an extrajudicial plea of guilty.

Concurring in the judgment in *Clark*, Justice Stevens stated: "As the Court recognizes, harmless-error inquiry remains inappropriate for certain constitutional violations no matter how strong the evidence of guilt may be. [Citations.] The Court suggests that the inapplicability of harmless error to these violations rests on concerns about reliability and accuracy, and that such concerns are the only relevant consideration in determining the applicability of harmless error. [Citation.] In fact, however, violations of certain constitutional rights are not, and should not be, subject to harmless-error analysis because those rights protect important values that are unrelated to the truth-seeking function of the trial. Thus, . . . [t]he admission of a coerced confession can never be harmless even though the basic trial process was otherwise completely fair and the evidence of guilt overwhelming. In short, . . . our Constitution, and our criminal justice system, protect other values besides the reliability of the guilt or innocence determination." (*Rose* v. *Clark, supra*, 478 U.S. at pp. 586-588 [92 L.Ed.2d at pp. 476-478], fn. omitted (conc. opn. of Stevens, J.).)

Accordingly, the rule of automatic reversal survived the formal advent of harmless-error analysis in *Chapman* and its subsequent development in *Clark*. Indeed, the rule was explicitly reaffirmed in both decisions. The *Chapman* court simply cited to the unquestioned authority of *Payne*. (*Chapman* v. *California, supra*, 386 U.S. at p. 23, fn. 8 [17 L.Ed.2d at p. 710].) For its part, the *Clark* court—making an awkward attempt to fit settled federal constitutional law to its procrustean bed of reliability—asserted that the "use of [a] coerced confession" "abort[s] the basic trial process . . . ." (*Rose* v. *Clark, supra*, 478 U.S. at p. 578, fn. 6 [92 L.Ed.2d at p. 470].)

*Chapman* and *Clark* were manifestly right to reaffirm the rule of automatic reversal. The threat of harm that harmless-error analysis is designed to assess concerns whether or not the outcome of an individual criminal trial is reliable. The harm that the admission of a coerced confession necessarily causes is the undermining of fairness in the contest between the government and the individual and, ultimately, the legitimacy of the criminal justice system itself. Hence, the application of harmless-error analysis to the introduction of a coerced confession is inappropriate: such analysis does not even

take cognizance of the injury peculiar to error of this sort. The harm of a coerced confession can be cured only by reversal of the judgment and exclusion of the confession at any retrial.[5]

## B. *California Law*

Separately and independently, it is the rule in California that the admission of a defendant's coerced confession into evidence at a criminal trial requires automatic reversal. (See, e.g., *People* v. *Jimenez, supra,* 21 Cal.3d at pp. 605-606; *People* v. *Sanchez* (1969) 70 Cal.2d 562, 571 [75 Cal.Rptr. 642, 451 P.2d 74]; *People* v. *Matteson* (1964) 61 Cal.2d 466, 469 [39 Cal.Rptr. 1, 393 P.2d 161] [hereafter sometimes *Matteson*]; *People* v. *Brommel* (1961) 56 Cal.2d 629, 634 [15 Cal.Rptr. 909, 364 P.2d 845]; *People* v. *Trout* (1960) 54 Cal.2d 576, 585 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418]; *People* v. *Berve* (1958) 51 Cal.2d 286, 290 [332 P.2d 97] [hereafter sometimes *Berve*]; *People* v. *Loper, supra,* 159 Cal. at p. 20; *People* v. *Barric* (1874) 49 Cal. 342, 345; *People* v. *Johnson* (1871) 41 Cal. 452, 455; *People* v. *Ah How* (1867) 34 Cal. 218, 223-224.)

The rationale of our rule of automatic reversal rests on the policy of fairness in the contest between the government and the individual, which underlies the state constitutional privilege against self-incrimination and the related rule barring the admission of a coerced confession. In *People* v. *Berve, supra,* 51 Cal.2d 286, one of the landmark decisions in this area, we made the point plain: The introduction of a coerced confession "constitutes a denial of due process of law . . . under the . . . state Constitution[] requiring a reversal of the conviction although other evidence may be consistent with guilt. [Citations.] '. . . Coerced confessions offend the community's sense of fair play and decency. . . . Nothing would be more calculated to discredit law and thereby to brutalize the temper of a society.' "

[5]Of course, "the presence of functions extending beyond factfinding reliability does not necessarily place a constitutional violation outside the reach of [harmless-error analysis under] *Chapman.* The self-incrimination privilege serves a variety of interests beyond the protection of the innocent, yet the Court in *Chapman* applied the harmless error standard to an infringement of that right [under *Griffin* v. *California* (1965) 380 U.S. 609, 611-615 [14 L.Ed.2d 106, 108-110, 85 S.Ct. 1229], which prohibits comment on a defendant's failure to testify at trial that invites or allows the jury to infer guilt therefrom]. Similarly, the . . . [exclusionary] rule [of *Mapp* v. *Ohio* (1961) 367 U.S. 643, 655 (6 L.Ed.2d 1081, 1089-1090, 81 S.Ct. 1684, 84 A.L.R.2d 933)] is designed to protect a right of privacy guaranteed by the Fourth Amendment, but the Court has held (unanimously) that the *Chapman* harmless error standard applies to *Mapp* violations. In both instances, however, the 'prophylactic' or 'supplemental' function of the particular constitutional standard being applied may explain why *Chapman* governs notwithstanding the non-reliability functions of the general guarantee. *Thus, the admission of a coerced confession, viewed as a core violation of the Fifth Amendment, is subject to the automatic reversal rule.*" (3 LaFave & Israel, *supra,* (1991 pocket supp.) § 26.6, pp. 89-90, fns. omitted and italics added.)

(*Id.* at p. 290, quoting *Rochin* v. *California* (1952) 342 U.S. 165, 173-174 [96 L.Ed. 183, 190-191, 72 S.Ct. 205, 25 A.L.R.2d 1396].)

Our rule too recognizes that a confession is indeed evidence, but evidence sui generis, being substantially an extrajudicial plea of guilty. A coerced guilty plea cannot support a conviction under California law. (See, e.g., *People* v. *Wadkins* (1965) 63 Cal.2d 110, 113-114 [45 Cal.Rptr. 173, 403 P.2d 429].) Under that same law, it follows, neither can a coerced confession.

Associated with the "fairness" rationale, although apparently only in dictum in a single coerced-confession case, viz., *People* v. *Matteson, supra,* 61 Cal.2d 466, is the more practical concern regarding the evidentiary force that inheres in confessions as such. In *People* v. *Parham* (1963) 60 Cal.2d 378 [33 Cal.Rptr. 497, 384 P.2d 1001]—which was *not* a coerced-confession case—we stated in dictum: "Almost invariably, . . . a confession will constitute persuasive evidence of guilt, and it is therefore usually extremely difficult to determine what part it played in securing the conviction. [Citations.] These considerations justify treating involuntary confessions as a class by themselves and refusing to inquire whether in rare cases their admission in evidence had no bearing on the result." (*Id.* at p. 385.) This language was alluded to in dictum in *Matteson,* which was decided some years after *Berve.* (See *People* v. *Matteson, supra,* 61 Cal.2d at p. 470.)

It must be noted that our rule of automatic reversal arose, and came to full stature, within a jurisprudence requiring harmless-error analysis.

Our rule goes back to the early years of statehood. (See *People* v. *Ah How, supra,* 34 Cal. at pp. 223-224; *People* v. *Johnson, supra,* 41 Cal. at p. 455; *People* v. *Barric, supra,* 49 Cal. at p. 345.)

It cannot be deemed, in its historical roots, simply a particularization of some "presumption of prejudice" that formerly attached to any error.

Virtually since California's admission into the Union in 1850, no such "presumption of prejudice" has existed in this state.

In 1851, harmless-error analysis was established by statute.

Statutes 1851, chapter 29, section 499, page 267: "After hearing the appeal, the Court shall give judgment without regard to technical error or defect, which does not affect the substantial rights of the parties." This provision is the source of the substantially identical Penal Code section

1258, which was enacted in 1872 and has remained unchanged: "After hearing the appeal, the court must give judgment without regard to technical errors or defects, or to exceptions, which do not affect the substantial rights of the parties."

So too, Statutes 1851, chapter 29, section 601, page 279: "Neither a departure from the form or mode prescribed by this Act in respect to any pleadings or proceedings, nor an error or mistake therein shall render the same invalid, unless it have actually prejudiced the defendant, or tended to his prejudice, in respect to a substantial right." This provision is the source of the substantially identical Penal Code section 1404, which was enacted in 1872 and has remained unchanged: "Neither a departure from the form or mode prescribed by this Code in respect to any pleading or proceeding, nor an error or mistake therein, renders it invalid, unless it has actually prejudiced the defendant, or tended to his prejudice, in respect to a substantial right."[6]

In *People* v. *Brotherton* (1874) 47 Cal. 388, 404 (hereafter sometimes *Brotherton*), we declared in an opinion delivered by Chief Justice Wallace for a unanimous court:

". . . Our judgment . . . , it must be remembered, is to be given 'without regard to technical error or defect which does not affect the substantial rights of the parties.'

"That a technical error has intervened at the trial is, therefore, not of itself enough to warrant our interference.

---

[6]Similarly, Statutes 1851, chapter 5, section 71, page 61: "The Court shall, in every stage of an action, disregard any error or defect in the pleadings, or proceedings, which shall not affect the substantial rights of the parties; and no judgment shall be reversed or affected by reason of such error or defect." This provision is the source of the substantially identical Code of Civil Procedure section 475 as enacted in 1872: "The Court must, in every stage of an action, disregard any error or defect in the pleadings or proceedings which does not affect the substantial rights of the parties, and no judgment shall be reversed or affected by reason of such error or defect." In 1897, the provision was amended into its present form: "The court must, in every stage of an action, disregard any error, improper ruling, instruction, or defect, in the pleadings or proceedings which, in the opinion of said court, does not affect the substantial rights of the parties. No judgment, decision, or decree shall be reversed or affected by reason of any error, ruling, instruction, or defect, unless it shall appear from the record that such error, ruling, instruction, or defect was prejudicial, and also that by reason of such error, ruling, instruction, or defect, the said party complaining or appealing sustained and suffered substantial injury, and that a different result would have been probable if such error, ruling, instruction, or defect had not occurred or existed. *There shall be no presumption that error is prejudicial, or that injury was done if error is shown.*" (Stats. 1897, ch. 47, § 1, p. 44, italics added.)

"The prisoners must go further, and affirmatively show in some way that their substantial rights have been injuriously affected by the error complained of. The burden is upon them to do so. Mere intendments indulged here are in support of the proceedings below, so far as such intendments are consistent with the record."[7]

We adhered to, and reaffirmed, *Brotherton* in such decisions as *People v. Nelson* (1880) 56 Cal. 77, 82; *People v. Barnhart* (1881) 59 Cal. 381, 384-385; and *People v. Clark* (1895) 106 Cal. 32, 40 [39 P. 53].

Thus, even as our rule of automatic reversal was arising, we were regularly conducting harmless-error analysis, in which we examined the entire cause, including the evidence. Accordingly, in many cases we concluded that errors of various sorts were not reversible because they were not prejudicial.

For example, we held errors in pleading harmless in decisions including *People v. Wynn* (1901) 133 Cal. 72, 73 [65 P. 126]; *People v. Haagen* (1903) 139 Cal. 115, 116-117 [72 P. 836]; and *People v. Mead* (1904) 145 Cal. 500, 502-504 [78 P. 1047].

Similarly, we deemed harmless errors of procedure in cases such as *People v. Sprague* (1879) 53 Cal. 491, 494-495; *People v. Gilbert* (1880) 57 Cal. 96, 98-99; *People v. O'Brien* (1891) 88 Cal. 483, 488-489 [26 P. 362]; *People v. Smalling* (1892) 94 Cal. 112, 119-120 [29 P. 421]; and *People v. Dolan* (1892) 96 Cal. 315, 318-319 [31 P. 107].

Also, we held erroneous instructions harmless in decisions including *People v. Nelson, supra,* 56 Cal. at pages 81 to 83; and *People v. Burns* (1883) 63 Cal. 614, 615.

Lastly—and of particular significance here—we deemed harmless errors bearing on the admission or exclusion of evidence in cases such as *People v.*

---

[7]It should be noted that in *People v. Murphy* (1873) 47 Cal. 103, 106, overruled on another point in *People v. Ditson* (1962) 57 Cal.2d 415, 440 [20 Cal.Rptr. 165, 369 P.2d 714], Justice Crockett held in his opinion for the court—Chief Justice Wallace not expressing any views— that "we must presume that [an erroneous instruction] was injurious to the defendant unless the contrary clearly appears." And in *People v. Stanley* (1873) 47 Cal. 113, 119, Justice Crockett held in his opinion for the court, over Chief Justice Wallace's vigorous dissent, that "every error in the admission of testimony is presumed to be injurious, unless the contrary clearly appears." Just a few months later, these two decisions were effectively overruled in *Brotherton,* as the words quoted in the text establish. To be sure, "presumption of prejudice" language did occasionally make an appearance in our opinions after *Brotherton,* but it did so only rarely. (See *People v. Furtado* (1881) 57 Cal. 345, 347; *People v. Sansome* (1890) 84 Cal. 449, 451 [24 P. 143]; *People v. Moore* (1894) 103 Cal. 508, 511 [37 P. 510], overruled on another point, *People v. Russell* (1909) 156 Cal. 450, 458-459 [105 P. 416]; *People v. Richards* (1902) 136 Cal. 127, 128-129 [68 P. 477].)

*Lee Chuck* (1889) 78 Cal. 317, 321 [20 P. 719]; *People* v. *Nelson* (1890) 85 Cal. 421, 425, 429 [24 P. 1006]; *People* v. *Dolan, supra,* 96 Cal. at page 319; *People* v. *Greening* (1894) 102 Cal. 384, 386-387 [36 P. 665]; *People* v. *Daniels* (1894) 105 Cal. 262, 265 [38 P. 720]; *People* v. *Clark, supra,* 106 Cal. at pages 38 to 41; *People* v. *Barthleman* (1898) 120 Cal. 7, 15 [52 P. 112]; *People* v. *Wynn, supra,* 133 Cal. at page 73; and *People* v. *Glaze* (1903) 139 Cal. 154, 160-162 [72 P. 965], disapproved on another point in *Funk* v. *Superior Court* (1959) 52 Cal.2d 423, 425 [340 P.2d 593].

At a special election held on October 10, 1911, the people approved Proposed Senate Constitutional Amendment No. 26, and thereby added former section 4½ to article VI of the California Constitution (hereafter sometimes former section 4½): "No judgment shall be set aside, or new trial granted in any criminal case on the ground of misdirection of the jury or the improper admission or rejection of evidence, or for error as to any matter of pleading or procedure, unless, after an examination of the entire cause including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." In 1914, the constitutional provision was amended as to scope, in order to cover "any case," civil as well as criminal, and also as to phrasing. In 1966, it was repealed as section 4½ and added as section 13 (hereafter sometimes section 13): "No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."

Thus, even as our rule of automatic reversal came to full stature, we regularly conducted harmless-error analysis, in which we examined the entire cause, including the evidence. Accordingly, in cases too numerous even to cite representatively, we have concluded that errors of various sorts were not reversible because they were not prejudicial.

The practice we have adopted and followed over the years makes plain what is implicit in our decisions, viz., that our rule of automatic reversal treats the admission of a coerced confession as itself a "miscarriage of justice" (Cal. Const., art. VI, § 13), which at the very least "tend[s] to [the defendant's] prejudice . . . in respect to a substantial right" (Pen. Code, § 1404) and cannot be deemed a mere "technical" error (*id.,* § 1258). (Cf. *Davis* v. *City of Berkeley* (1990) 51 Cal.3d 227, 239 [272 Cal.Rptr. 139, 794 P.2d 897] [holding that the "practices adopted and followed by local governments to comply with the requirements of article XXXIV" of the California Constitution, dealing with voter approval of low-rent housing

projects, "may appropriately be considered, and given considerable deference, in determining that constitutional provision's meaning"].) On occasion, it is true, we have failed to apply our rule. Deviation, however, is not defeasance.

Our rule of automatic reversal is not inconsistent with harmless-error analysis as established by sections 1258 and 1404 of the Penal Code and mandated by section 13 of article VI of the California Constitution.

We need not detain ourselves long so far as harmless-error analysis under the statutory provisions is concerned. It is undisputed, and indeed indisputable, that the privilege against self-incrimination, under both the United States and California Constitutions, is one of the most "substantial" of "rights." (Pen. Code, § 1258.) Similarly, it is settled beyond peradventure that the admission of a coerced confession must at the very least "tend[] to [the defendant's] prejudice" in respect to this most "substantial right." (*Id.*, § 1404.)

As for harmless-error analysis under the constitutional provision, we must spend considerably more time. The construction and application of section 13—former section 4½—of article VI of the California Constitution are not easily determined, contrary to the evident belief of the majority (see maj. opn., *ante*, at pp. 487-493) and others (see, e.g., *People* v. *Watson* (1956) 46 Cal.2d 818, 834-837 [299 P.2d 243] [hereafter sometimes *Watson*]; *People* v. *Brown* (1988) 46 Cal.3d 432, 466-467 [250 Cal.Rptr. 604, 758 P.2d 1135] [hereafter sometimes *Brown*] (conc. opn. of Mosk, J.)).

That is because the so-called "seminal decision" (maj. opn., *ante*, at pp. 491, 506) in *People* v. *O'Bryan* (1913) 165 Cal. 55 [130 P. 1042] (hereafter sometimes *O'Bryan*) raises far more questions than it answers.

At the outset, we must recognize, and in fact emphasize, a fact that has generally been overlooked. In *O'Bryan*, there is no opinion of the court. Justice Sloss authored the lead opinion, in which Justice Angellotti and Justice Shaw joined. (*People* v. *O'Bryan*, *supra*, 165 Cal. at pp. 57-68 (lead opn. by Sloss, J.).) For his part, Justice Lorigan authored an opinion concurring in the judgment, in which Justice Melvin and Justice Henshaw joined. (*Id.* at pp. 68-70 (conc. opn. of Lorigan, J.).) Neither opinion commanded a majority.

In the lead opinion in *O'Bryan*, Justice Sloss set forth the following facts.

At trial before a jury, it was established beyond dispute that the defendant was a member of a labor organization striking the Llewellyn Iron Works,

and that on the date in question he fatally shot one John D. Avila, a nonunion worker at Llewellyn.

The point of controversy was whether or not the defendant intended to kill Avila.

The prosecution sought to prove such intent. It presented evidence to show that the defendant sought to terrorize Avila because he was working for Llewellyn. Included, apparently, was certain testimony that the defendant had given before a grand jury. In Justice Sloss's words: "On the day of the shooting, . . . the defendant was arrested on suspicion of being concerned in the killing of Avila, and was held in custody in the county jail. [Some days later,] . . . he was, by the sheriff, taken before the grand jury which was investigating the homicide, and was sworn and questioned concerning his actions before and at the time of the shooting. He was not informed of his constitutional right to decline to be a witness against himself, nor was he warned that his statements might be used against him. In response to the examination of the district attorney, he made to the grand jury a number of statements. These statements did not amount to a confession," indeed they were substantially unrelated to the shooting itself, "but were admissible in evidence against the defendant as declarations against interest . . . ." (*People* v. *O'Bryan, supra*, 165 Cal. at pp. 60-61 (lead opn. by Sloss, J.).)

The defendant denied intent to kill. Taking the stand, he testified on direct examination that he sought merely to frighten Avila, and not to cause him any injury. On cross-examination, the prosecution questioned him, over objection, as to certain testimony that he had given before the grand jury.

The jury returned a verdict finding the defendant guilty of murder of the first degree. The superior court entered judgment accordingly.

On appeal, Justice Sloss concluded that the admission of the defendant's grand jury testimony was error. "This testimony should not have been admitted. The course pursued was in violation of the constitutional right of every person not to 'be compelled, in any criminal case, to be a witness against himself.' (Const. Cal., art. I, sec. 13.)" (*People* v. *O'Bryan, supra*, 165 Cal. at p. 61 (lead opn. by Sloss, J.).) "Here the defendant, when brought before the grand jury, was in custody under an accusation of guilt of the crime under investigation. Taken into the presence of that body by the sheriff, sworn and examined without the aid of counsel, and without any instruction as to his rights, it cannot be said that his submission to the interrogation was in any fair sense voluntary. The great preponderance of authority is that testimony so given by a defendant is not to be used against him." (*Id.* at p. 62 (lead opn. by Sloss, J.).)

"But, conceding that error was committed in the admission of this testimony," Justice Sloss continued, "there still remains the question whether the character and effect of the error were such as to require a reversal." (*People v. O'Bryan, supra,* 165 Cal. at p. 63 (lead opn. by Sloss, J.).)

Up to this point in Justice Sloss's lead opinion, as will subsequently appear, Justice Lorigan, together with the two justices who joined in his concurrence, did not disagree. In what follows, however, Justice Sloss spoke only for himself and for the two justices who joined in his opinion.

The question of reversal, stated Justice Sloss, "must be answered with due regard to the terms of section 4 of article VI, added to the constitution by amendment adopted in 1911." (*People v. O'Bryan, supra,* 165 Cal. at p. 63 (lead opn. by Sloss, J.).)

"The general purpose of the amendment," he said, "is plain. Inasmuch as under the pre-existing provisions of the constitution the jurisdiction of the supreme court and of the district courts of appeal was limited in criminal cases 'to questions of law alone' [citation] it was incumbent upon these courts to reverse any judgment of conviction based upon proceedings which were affected in any degree by substantial error of law. . . . [W]here [the error was not trivial or could have prejudiced a substantial right] . . . and . . . was one which might or might not have turned the scale against the defendant, the limitation of the appellate jurisdiction to questions of law precluded the reviewing courts from weighing the evidence for the purpose of forming an opinion whether the error had or had not in fact worked injury. Having no jurisdiction in matters of fact, the court in which the appeal was pending was bound to apply the doctrine that prejudice was presumed to follow from substantial error." (*People v. O'Bryan, supra,* 165 Cal. at pp. 63-64 (lead opn. by Sloss, J.).)

"By the new constitutional provision," Justice Sloss went on, "the appellate courts are empowered to examine 'the entire cause, *including the evidence*' and are required to affirm the judgment, notwithstanding error, if error has not resulted 'in a miscarriage of justice.' " (*People v. O'Bryan, supra,* 165 Cal. at p. 64, italics in original (lead opn. by Sloss, J.).)

"What, then," asked Justice Sloss, "is a miscarriage of justice? The phrase is a general one and has not yet acquired a precise meaning." (*People v. O'Bryan, supra,* 165 Cal. at p. 64 (lead opn. by Sloss, J.).) "[W]e do not understand that the amendment in question was designed to repeal or abrogate the guaranties accorded persons accused of crime by other parts of the same constitution or to overthrow all statutory rules of procedure and

evidence in criminal cases." (*Id.* at p. 65 (lead opn. by Sloss, J.).) "But it does not follow that every invasion of even a constitutional right necessarily requires a reversal. It may well be that the court, after examining the 'entire cause including the evidence,' is of the opinion that the error complained of, whatever its character, has not resulted in a miscarriage of justice. The mere fact that the assignment of error is based upon a provision of the constitution is not conclusive. The final test is the opinion of the appellate court upon the result of the error." (*Id.* at p. 66 (lead opn. by Sloss, J.).)

"Section 4½ of article VI of our constitution," according to Justice Sloss, "must be given at least the effect of abrogating the old rule that prejudice is presumed from any error of law. Where error is shown it is the duty of the court to examine the evidence and ascertain from such examination whether the error did or did not in fact work any injury. The mere fact of error does not make out a *prima facie* case for reversal which must be overcome by a clear showing that no injury could have resulted." (*People* v. *O'Bryan, supra,* 165 Cal. at p. 65 (lead opn. by Sloss, J.).)

Applying former section 4½ to the facts, Justice Sloss concluded that the erroneous admission of the defendant's grand jury testimony had not "resulted in a miscarriage of justice," essentially because "[e]very material matter covered by [the testimony] was shown to the jury by other evidence, which was concededly admissible, and the truth of which was not contradicted." (*People* v. *O'Bryan, supra,* 165 Cal. at pp. 66, 67 (lead opn. by Sloss, J.).)

Let us step out of *O'Bryan* for the moment. Having ourselves briefly reviewed the relevant history, we are compelled to conclude that Justice Sloss's statements are at best dubious. We need only recall two facts. First, for almost four decades prior to the addition of former section 4½, we had conducted harmless-error analysis, and had done so without any "presumption of prejudice." (See, e.g., *People* v. *Nelson, supra,* 56 Cal. at p. 82; *People* v. *Barnhart, supra,* 59 Cal. at pp. 384-385; *People* v. *Clark, supra,* 106 Cal. at p. 40.) Second, during that same period, we had conducted such analysis by means of an examination of "the entire cause, *including the evidence.*" (See, e.g., *People* v. *Brotherton, supra,* 47 Cal. at pp. 403-405; *People* v. *Lee Chuck, supra,* 78 Cal. at p. 321; *People* v. *Nelson, supra,* 85 Cal. at pp. 425, 429; *People* v. *Dolan, supra,* 96 Cal. at p. 319; *People* v. *Greening, supra,* 102 Cal. at pp. 386-387; *People* v. *Daniels, supra,* 105 Cal. at p. 265; *People* v. *Clark, supra,* 106 Cal. at pp. 38-41; *People* v. *Barthleman, supra,* 120 Cal. at p. 15; *People* v. *Wynn, supra,* 133 Cal. at p. 73; *People* v. *Glaze, supra,* 139 Cal. at pp. 160-162.)

In attempting to determine the "general purpose" of former section 4½, let us look to the arguments of the proponents of proposed Senate Constitutional

Amendment No. 26, which added the provision to the California Constitution.

"The object of this amendment is to enable our courts of last resort to sustain verdicts in criminal cases unless there has been a miscarriage of justice, or, putting it in another way, its purpose is to render it unnecessary for the higher courts to grant the defendant in a criminal case a new trial for unimportant errors. It is designed to meet the ground of common complaint that criminals escape justice through technicalities." (Ballot Pamp., Proposed Amends. to the Cal. Const. with legislative reasons for and against adoption, Special Statewide Elec. (Oct. 10, 1911) [hereafter Ballot Pamp.], reasons for adoption of Sen. Const. Amend. No. 26 by Sen. A. E. Boynton; accord, *id.*, reasons for adoption of Sen. Const. Amend. No. 26 by Sen. E. S. Birdsall.)

". . . [T]he adjective branch of our law has not kept pace with the development of substantive law. The trial of a criminal is so hedged about with technicalities that it has grown almost impossible to convict one whose wealth is sufficient to enable him to employ counsel skilled in the technique of criminal law. Thus there has grown up two systems of law—one for the poor, the other for the rich. The pauper prisoner is subjected to the iniquities of the 'third degree' to secure from him incriminating evidence, while the wealthy one is surrounded by a corps of defenders, whose skill in barricading their client behind technicalities is usually commensurate with the fees secured." (Ballot Pamp., *supra*, reasons for adoption of Sen. Const. Amend. No. 26 by Sen. A. E. Boynton.)

". . . The reversal of the just conviction of a guilty man upon purely technical errors is the prime cause of want of confidence in our courts." (Ballot Pamp., *supra*, reasons for adoption of Sen. Const. Amend. No. 26 by Sen. A.E. Boynton.)

In view of the foregoing, the "general purpose" of former section 4½ was simply to constitutionally preclude reversals in criminal cases by appellate courts, and the attendant loss of public confidence in the criminal justice system, when the errors committed at trial were "unimportant" or "purely technical."

Informed with such an intent, the constitutional provision shows itself inapplicable to the admission of a coerced confession. As stated, a confession is evidence sui generis, being substantially an extrajudicial plea of guilty. The admission of a coerced confession, of course, is neither "unimportant" nor "purely technical." Rather, it is a profoundly grave defect going to the very heart of a criminal trial under the California Constitution, which

effectively defines a "fair" trial as one at which a coerced confession is not admitted. The proponents of the measure suggested as much. They made plain that former section 4½ was aimed against the "wealthy [prisoner]," who "is surrounded by a corps of defenders, whose skill in barricading their client behind technicalities is usually commensurate with the fees secured." (Ballot Pamp., *supra*, reasons for adoption of Sen. Const. Amend. No. 26 by Sen. A. E. Boynton.) They implied that it had nothing to do with the "pauper prisoner"—like the defendant in this very case—who "is subjected to the iniquities of the 'third degree' to secure from him incriminating evidence . . . ." (*Ibid.*)

It follows that the constitutional provision does not even reach our rule of automatic reversal for the admission of a coerced confession.

True, the proponents of the measure criticized the so-called "presumption of prejudice." (Ballot Pamp., *supra*, reasons for adoption of Sen. Const. Amend. No. 26 by Sen. A. E. Boynton; *id.*, reasons for adoption of Sen. Const. Amend. No. 26 by Sen. E. S. Birdsall.) But they did so only in the context of errors that are "unimportant" or "purely technical." (*Id.*, reasons for adoption of Sen. Const. Amend. No. 26 by Sen. A. E. Boynton; accord, *id.*, reasons for adoption of Sen. Const. Amend. No. 26 by Sen. E. S. Birdsall.)

Had the proponents of the measure desired to affect our rule, which does not "presume prejudice" for an "unimportant" or "purely technical" error but requires automatic reversal for a profoundly grave defect going to the very heart of a criminal trial, they would undoubtedly have given some indication. They did not. To do so would have been easy. They searched back almost 40 years to assail the "doctrine announced in" *People* v. *Stanley*, *supra*, 47 Cal. 113, "that 'every error in the admission of testimony is presumed to be injurious unless the contrary clearly appears[]' " (Ballot Pamp., *supra*, reasons for adoption of Sen. Const. Amend. No. 26 by Sen. E. S. Birdsall)—even though *Stanley* was short-lived and long dead, having been effectively overruled in *People* v. *Brotherton*, *supra*, 47 Cal. 388, only a few months after it was decided. Certainly, they could not have missed *People* v. *Loper*, *supra*, 159 Cal. 6, which had been handed down not a year earlier. There, we held that the admission of a coerced confession was reversible even on the assumption that "the prosecution had a perfect case without the confession," i.e., "the evidence in this case was so complete without the confession of the defendant that the jury would have found him guilty even if the confession had been entirely omitted." (*Id.* at p. 20.)

To be fair, Justice Sloss did not completely miss what "miscarriage of justice" under former section 4½ might comprehend. "When we speak of

administering 'justice' in criminal cases, under the English or American system of procedure, we mean something more than merely ascertaining whether an accused is or is not guilty. It is an essential part of justice that the question of guilt or innocence shall be determined by an orderly legal procedure, in which the substantial rights belonging to defendants shall be respected." (*People* v. *O'Bryan, supra,* 165 Cal. at p. 65 (lead opn. by Sloss, J.).)

"For example," said Justice Sloss, "if a court should undertake to deny to a defendant charged with a felony the right of trial by jury, and after a hearing of the evidence render a judgment of conviction, it cannot be doubted that such judgment should be set aside even though there had been the clearest proof of guilt." (*People* v. *O'Bryan, supra,* 165 Cal. at pp. 65-66 (lead opn. by Sloss, J.).)

"Or," he went on, "if a defendant, after having been once acquitted, should be again brought to trial and thereupon convicted, in disregard of his plea that he had been once in jeopardy, it would hardly be suggested that because he was in fact guilty, no 'miscarriage of justice' had occurred." (*People* v. *O'Bryan, supra,* 165 Cal. at p. 66 (lead opn. by Sloss, J.).)

Or—we might add—if a court should receive in evidence a defendant's coerced confession, it cannot be questioned that any ensuing conviction should be overturned notwithstanding guilt proved beyond a reasonable doubt.

This is because the harm caused by each of the three errors—denial of a jury trial, rejection of a plea of once in jeopardy, and admission of a coerced confession—is the undermining of fairness in the contest between the government and the individual and, ultimately, the legitimacy of the criminal justice system itself. Such harm can be cured only by reversal.

". . . When a defendant has been denied any essential element of a fair trial or due process," which must surely include the state constitutional privilege against self-incrimination and the related rule barring the admission of a coerced confession, "even the broad saving provisions of section 4½ of article VI of our state Constitution cannot remedy the vice and the judgment cannot stand." (*People* v. *Sarazzawski* (1945) 27 Cal.2d 7, 11 [161 P.2d 934] (*per curiam*).) "The fact that a record shows a defendant to be guilty of a crime does not necessarily determine that there has been no miscarriage of justice." (*People* v. *Mahoney* (1927) 201 Cal. 618, 627 [258 P. 607] (*per curiam*).)

Let us now return to *O'Bryan.* In his concurring opinion, Justice Lorigan agreed with Justice Sloss's result affirming the judgment but disagreed with

his views "as to the construction of section 4½ of article VI of the constitution and its application under the evidence." (*People* v. *O'Bryan, supra,* 165 Cal. at p. 68 (conc. opn. of Lorigan, J.).) He was "of the opinion that neither the construction nor application of this section is necessarily involved in the disposition of this appeal, and, therefore, the discussion upon it is *obiter* . . . ." (*Ibid.*)

Justice Lorigan continued: "It was, as pointed out in the [lead] opinion, error for the court to have admitted in evidence on behalf of the state the statements made by the defendant before the grand jury. This was in violation of the constitutional right of the defendant not to 'be compelled in any criminal case to be a witness against himself.' " (*People* v. *O'Bryan, supra,* 165 Cal. at p. 69 (conc. opn. of Lorigan, J.).)

Such an error, Justice Lorigan suggested, might generally require automatic reversal, notwithstanding former section 4½: "If the defendant had not subsequently become a witness on the trial in his own behalf but had stood squarely upon the error of the court in permitting evidence of those statements, I am not prepared just now to say that against this violation of a constitutional right the section of the constitution could be interposed." (*People* v. *O'Bryan, supra,* 165 Cal. at p. 69 (conc. opn. of Lorigan, J.).)

Automatic reversal, Justice Lorigan concluded, was not required in this case: "[H]ere the defendant did not stand upon the error. He became subsequent to its admission a witness in his own behalf and gave testimony in chief upon such matters as warranted the district attorney upon cross-examination in covering all the matters concerning which he had made statements before the grand jury. This district attorney was justified in cross-examining him as to all these matters and the testimony of the defendant respecting them was substantially a reiteration of the statements he made before the grand jury." (*People* v. *O'Bryan, supra,* 165 Cal. at p. 69 (conc. opn. of Lorigan, J.).)

Therefore, Justice Lorigan proceeded, what controlled was the "general rule" of harmless-error analysis, "to which this court long since has given succinct utterance . . . in *People* v. *Brotherton,* 47 Cal. 388, 404. . . ." "[W]hatever error was committed by the court in the first instance was cured by this subsequently properly elicited testimony covering the same matters. The original prejudicial character as error was obviated by this subsequent confirmatory evidence of the defendant and under the general rule which has always obtained here the error became harmless and could not be successfully invoked by defendant to obtain a reversal." (*People* v. *O'Bryan, supra,* 165 Cal. at p. 69 (conc. opn. of Lorigan, J.).)

Returning to his beginning, Justice Lorigan stated: "This being the general rule applied before the constitutional amendment referred to was made, it is as directly applicable now since the amendment, and the assignment of the ruling as error was without merit by virtue of the general rule and in my opinion, therefore, it is unnecessary *obiter* to construe or apply the amendment in disposing of this alleged error." (*People* v. *O'Bryan, supra,* 165 Cal. at p. 69 (conc. opn. of Lorigan, J.).)

In the years after *O'Bryan,* we revisited the question of the construction and application of former section 4½ in only one major decision.

In *People* v. *Watson, supra,* 46 Cal.2d 818, Justice Spence, in his opinion for the court, addressed former section 4½. In all respects save one, he did little more than follow Justice Sloss's lead opinion in *O'Bryan.* The exception was this: he articulated what was to become the general standard for harmless-error analysis under the constitutional provision. "Giving due consideration to the varying language heretofore employed in relating the constitutional amendment to the particular situations involved," he stated, "it appears that the test generally applicable may be stated as follows: That a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People* v. *Watson, supra,* 46 Cal.2d at p. 836.)

Three points bear emphasis.

First, Justice Spence's opinion did not hold that former section 4½ precluded automatic reversal for certain errors, but merely stated the "test" that was "generally applicable" when harmless-error analysis was appropriate. "[C]ertain fundamental rights," he declared, "are guaranteed to the defendant upon which he can insist regardless of the state of the evidence, such as the right to a jury trial and the right to protection under the plea of once in jeopardy . . . ." (*People* v. *Watson, supra,* 46 Cal.2d at p. 835.)

Second, Justice Spence's opinion did not hold that former section 4½ mandated the so-called "reasonable probability" standard as the only "test" that could be employed when harmless-error analysis is appropriate, but simply defined that standard as the "test" that was *"generally* applicable." (*People* v. *Watson, supra,* 46 Cal.2d at p. 836, italics added.) In a word, the constitutional provision does not "expressly or impliedly mandate[] any specific standard of prejudice for any kind of error in any kind of proceeding." (*People* v. *Brown, supra,* 46 Cal.3d at p. 467 (conc. opn. of Mosk, J.).)

Third, and most important, Justice Spence's opinion did not raise the "reasonable probability" standard to constitutional status alongside former section 4½ itself. That test is merely a gloss on the constitutional provision. (See *People* v. *Watson, supra,* 46 Cal.2d at pp. 834-837.)

In *Watson,* Justice Carter, in dissent, disagreed with Justice Spence's opinion as to both the construction and application of former section 4½. One of his comments should be noted: "It is perfectly obvious to me"—and, indeed, it should be perfectly obvious to all who give the matter any consideration—"that the concept of the framers of section 4½ of article VI of our Constitution was that technical errors in instructions to the jury or in the admission or rejection of evidence or errors in pleading or procedure which could not affect the result in a case should not be relied upon as a ground for the reversal of a judgment." (*People* v. *Watson, supra,* 46 Cal.2d at p. 840 (dis. opn. of Carter, J.).)

In view of the foregoing, we must allow that the construction and application of what was formerly section 4½ and what is now section 13 may be hard to determine fully and with precision. But we can at least arrive at this conclusion. The constitutional provision was *not* intended to abrogate or obviate our rule of automatic reversal for the admission of a coerced confession. It was designed simply to constitutionally preclude a reversal when the error in question is "unimportant" or "purely technical"—unlike the introduction of a coerced confession, which is a profoundly grave defect going to the very heart of a criminal trial.

In concluding to the contrary, the majority make several missteps that prove to be fatal.

First and most serious, the majority fail to recognize that what was formerly section 4½ and what is now section 13 was not intended even to reach our rule of automatic reversal. They pay too little attention to the constitutional provision's words and its historical background and context, and too much attention to Justice Sloss's lead opinion in *O'Bryan.* The fact that several decisions have subsequently cited that opinion does not render it sound. Perhaps it was "clear" to Justice Sloss that the constitutional provision "applies to constitutional as well as to nonconstitutional errors . . . ." (Maj. opn., *ante,* at p. 501.) It was not clear to Justice Lorigan or, more significantly, to the proponents of the measure, who intended it to forgive "unimportant" or "purely technical" errors, among which constitutional defects do not seem to figure. In addition, our many decisions recognizing the rule of automatic reversal did not "los[e] sight of the principal purpose and significance" of the constitutional provision. (*Id.* at p. 503.) Rather, the

majority themselves appear never to have caught sight of such matters in the first place.

Second and perhaps as serious, the majority assume without basis that a criminal trial can be deemed "fair" under the California Constitution even if a coerced confession is admitted. Surely the framers of the state charter would be surprised. The state constitutional privilege against self-incrimination and the related rule barring the admission of a coerced confession effectively define a trial as "fair" only if it is without such a taint. In the lead opinion in *O'Bryan*, Justice Sloss was certainly right on one point: "When we speak of administering 'justice' in criminal cases, under the English or American system of procedure, we mean something more than merely ascertaining whether an accused is or is not guilty. It is an essential part of justice that the question of guilt or innocence shall be determined by an orderly legal procedure, in which the substantial rights belonging to defendants shall be respected." (*People* v. *O'Bryan, supra,* 165 Cal. at p. 65 (lead opn. by Sloss, J.).) It appears beyond question that "substantial rights" include the privilege against self-incrimination and that "orderly legal procedure" does not allow the introduction of a coerced confession.

Third, and related to the preceding, the majority treat a confession as though it were "ordinary" evidence, which has long been subject to harmless-error analysis. Of course, it is not. As stated, a confession is evidence sui generis, being substantially an extrajudicial plea of guilty.

Fourth, the majority, in purporting to consider our rule of automatic reversal and its rationale, actually set up and knock down what is nothing more than a straw man.

As stated, the rule with which we are concerned requires automatic reversal for the admission of a coerced confession. But the rule that the majority choose to attack is the derivative and broader one that treats as reversible per se the introduction of *any* confession violative of the United States Constitution. The majority confuse the two. Contrary to their implication, the latter rule is not at issue in this matter. (See fn. 1, *ante.*)

Similarly, the rationale of our rule of automatic reversal for the admission of a coerced confession rests on the policy of fairness in the contest between the government and the individual, which underlies the state constitutional privilege against self-incrimination and the related rule barring the admission of a coerced confession. But the rationale that the majority decide to criticize depends on considerations regarding the inherent evidentiary force of confessions as such, which is not substantially associated with the rule at

issue. The majority confuse the two rationales. Contrary to their implication, the considerations referred to above are not prominent in coerced-confession cases. (See, e.g., *People v. Jimenez, supra,* 21 Cal.3d at pp. 605-606; *People v. Sanchez, supra,* 70 Cal.2d at p. 571; *People v. Brommel, supra,* 56 Cal.2d at p. 634; *People v. Trout, supra,* 54 Cal.2d at p. 585; *People v. Berve, supra,* 51 Cal.2d at p. 290; *People v. Loper, supra,* 159 Cal. at p. 20; *People v. Barric, supra,* 49 Cal. at p. 345; *People v. Johnson, supra,* 41 Cal. at p. 455; *People v. Ah How, supra,* 34 Cal. at pp. 223-224; but see *People v. Matteson, supra,* 61 Cal.2d at p. 470 [dictum].)

The majority's confusion of rules and rationales is manifest.

Their discussion focuses largely and extensively on *People v. Schader* (1965) 62 Cal.2d 716, 728-731 [44 Cal.Rptr. 193, 401 P.2d 665] (hereafter sometimes *Schader*), and its progeny, including *People v. Jacobson* (1965) 63 Cal.2d 319, 329-331 [46 Cal.Rptr. 515, 405 P.2d 555] (hereafter sometimes *Jacobson*). These decisions did not involve coerced confessions, but instead statements obtained in violation of a criminal defendant's Sixth Amendment right to counsel as enunciated in the then "new doctrine" (5 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Trial, § 2676, p. 3215) of *Escobedo v. Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], and *People v. Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].

*Schader* is the source of the rule that the introduction of *any* confession violative of the United States Constitution is reversible per se. It employed as its foundation the rule requiring automatic reversal for the admission of a coerced confession. It proceeded to extend that rule into the derivative and broader rule referred to above. In doing so, it did not rely on the nature of the underlying violation. The reason is manifest: as explained, the admission of a coerced confession is a profoundly grave defect going to the very heart of a criminal trial; the introduction of a statement offensive to *Escobedo* and *Dorado* is not comparable. Rather, *Schader* used as its rationale the fact that evidentiary force inheres in confessions as such—that, in its own words, any "confession operates as a kind of evidentiary bombshell which shatters the defense" (*People v. Schader, supra,* 62 Cal.2d at p. 731). *Jacobson* followed *Schader* in this regard, recognizing the rule and its rationale. (See *People v. Jacobson, supra,* 63 Cal.2d at pp. 329-330.) It also distinguished *Schader* in accordance with its own terms, concluding that, on the peculiar facts of that particular case, two statements "improperly obtained" under *Escobedo* and *Dorado* "were . . . merely cumulative" to eight properly obtained statements. (*Id.* at p. 331.)

As a result of their confusion, the majority in effect challenge not the rule of automatic reversal for the admission of a coerced confession but rather the

derivative and broader rule that the introduction of *any* confession violative of the United States Constitution is reversible per se. Whether they are successful—a dubious proposition—matters not. As stated, the latter rule is not at issue, only the former. Moreover, the latter rule may fall without taking down the former.

The majority attempt to hide their confusion of rules and rationales—from themselves or from others or from both, I cannot say—by declaring that "there is nothing in . . . any . . . decision of this court that supports the . . . distinction" set out above. (Maj. opn., *ante*, at p. 504, fn. 15.)

Can the majority possibly mean that the rule of automatic reversal for the admission of a coerced confession was not extended in *Schader* into the derivative and broader rule that the introduction of *any* confession violative of the United States Constitution is reversible per se? *Schader* itself belies any such claim. (See *People* v. *Schader, supra,* 62 Cal.2d at pp. 728-731.)

Or can the majority possibly mean that the rationale of the rule of automatic reversal for the admission of a coerced confession rests on the evidentiary force that inheres in confessions as such? Any such claim founders on coerced-confession cases decided both before and after *Schader,* including *People* v. *Jimenez, supra,* 21 Cal.3d 595, 605-606; *People* v. *Sanchez, supra,* 70 Cal.2d 562, 571; *People* v. *Brommel, supra,* 56 Cal.2d 629, 634; *People* v. *Trout, supra,* 54 Cal.2d 576, 585; *People* v. *Berve, supra,* 51 Cal.2d 286, 290; *People* v. *Loper, supra,* 159 Cal. 6, 20; *People* v. *Barric, supra,* 49 Cal. 342, 345; *People* v. *Johnson, supra,* 41 Cal. 452, 455; and *People* v. *Ah How, supra,* 34 Cal. 218, 223-224.

Among coerced-confession cases, the only apparent exception in this regard—such as it is—is our pre-*Schader* decision in *People* v. *Matteson, supra,* 61 Cal.2d 466. There, we concluded that the admission of a coerced confession required automatic reversal. (*Id.* at p. 469.) We also concluded that the error was not cured by the trial court's striking the confession and admonishing the jury to disregard it entirely. "In cases involving involuntary statements of the accused," we reasoned, "the weight of other evidence of guilt is not considered. *Incriminating statements from defendant's own tongue are most persuasive evidence of his guilt, and the part they play in securing a conviction cannot be determined.* (See *People* v. *Parham, supra,* 60 Cal.2d 378, 385.) For the same reason, an admonition or an instruction to the jury to disregard involuntary incriminating statements does not cure the erroneous admission of such statements." (*People* v. *Matteson, supra,* 61 Cal.2d at p. 470, italics added.)

To the extent that the majority imply that the italicized dictum in *Matteson* is somehow "typical" of coerced-confession cases (maj. opn., *ante,* p. 494),

they turn reality on its head. This language, as even a cursory review of the cited coerced-confession cases demonstrates, is altogether atypical. To claim otherwise is to indulge in revisionist history.

One final point: Our rule of automatic reversal is indeed *our* rule.

It arose more than a hundred years ago without citation to the United States Constitution or decisions construing that instrument. (See, e.g., *People* v. *Ah How, supra,* 34 Cal. at pp. 223-224; *People* v. *Johnson, supra,* 41 Cal. at p. 455; *People* v. *Barric, supra,* 49 Cal. at p. 345.)

Moreover, it came to full stature well before 1967. It was only in that year, in its landmark *Chapman* decision, that the United States Supreme Court declared that the question of reversibility for error in a state criminal trial, even error of federal constitutional dimension, was governed other than by state law. (See *Chapman* v. *California, supra,* 386 U.S. at pp. 22-24 [17 L.Ed.2d at pp. 709-711]; see, generally, *id.* at pp. 45-57 [17 L.Ed.2d at pp. 722-729] (dis. opn. of Harlan, J.).) Prior to that time it was commonly believed, apparently, that the issue was one of state law. Certainly that was our belief. (See, e.g., *People* v. *Bostick* (1965) 62 Cal.2d 820, 823-827 [44 Cal.Rptr. 649, 402 P.2d 529]; *People* v. *Powell* (1967) 67 Cal.2d 32, 56 [59 Cal.Rptr. 817, 429 P.2d 137] [implying that before *Chapman* we believed that "our inquiry" was "limited" to "article V, section 13, of our Constitution"]; see also *Chapman* v. *California, supra,* 386 U.S. at pp. 51-53 [17 L.Ed.2d at pp. 725-727] (dis. opn. of Harlan, J.) [implying that "California courts" had applied the "California harmless-error rule . . . incorporated in that State's constitution" to errors of federal constitutional dimension as well as those of state law].) To be sure, our rule has in its latter days become adorned with citations to federal constitutional provisions and decisions relating thereto. But it is simply not compelled by any of them.[8]

The majority recognize that our rule of automatic reversal is indeed *our* rule. Here, they do no more than bow to necessity.

---

[8]In *People* v. *Boyer* (1989) 48 Cal.3d 247 [256 Cal.Rptr. 96, 768 P.2d 610], we discussed in dictum the "rule" followed in California that " 'the improper introduction of a *confession* [i.e., a declaration of defendant's intentional participation in a criminal act] is considered reversible per se [citations], whereas wrongful introduction of an *admission* [i.e., the recital of facts tending to establish guilt when considered with the remaining evidence in the case] is deemed prejudicial unless the People show beyond a reasonable doubt that the error complained of did not contribute to the verdict. [Citations.] . . . .' " (*Id.* at pp. 279-280, fn. 23, italics, brackets, bracketed material, and ellipsis in original.) We stated: "This California distinction, never expressly divorced from federal law, is doubtful in light of *Rose* v. *Clark* (1986) 478 U.S. 570 [92 L.Ed.2d 460, 106 S.Ct. 3101]." (*Id.* at p. 280, fn. 23.) The "rule" that we discussed in *Boyer* is *not* our rule of automatic reversal for the admission of a coerced confession, but rather the derivative and broader rule that the introduction of *any* confession violative of the United States Constitution is reversible per se. By happenstance, however, some of our language in *Boyer* proves applicable here. Our rule of automatic reversal was

But in an apparent effort to diminish the authority of our rule, the majority seek to show that it arose *only* 35 years ago in *People* v. *Berve, supra,* 51 Cal.2d 286. The attempt falters on the facts. As stated, the rule goes back well over a century, not *merely* three and one-half decades. This is not to deny that *Berve* is peculiarly significant. In *Watson,* we restated, but did not invent, the long-established general rule of harmless-error analysis. Similarly, in *Berve,* which was decided only two years later, we restated, but did not invent, the long-established exception for the admission of a coerced confession.

Certainly, the majority's assertion that in the period before *Berve* we subjected the admission of coerced confessions to harmless-error analysis in "each" of "numerous" decisions (maj. opn., *ante,* pp. 494 & 502, fn. 14) is what may most charitably be labeled an overstatement. A brief review of the cases they cite proves the point.

Thus, in *People* v. *Gonzales* (1944) 24 Cal.2d 870 [151 P.2d 251], *People* v. *Rogers* (1943) 22 Cal.2d 787 [141 P.2d 722], and *People* v. *Ferdinand* (1924) 194 Cal. 555 [229 P. 341], we did not even consider whether to apply our rule of automatic reversal because we did not find any confession to have been coerced. Rather, in *Gonzales,* we simply held harmless the erroneous refusal of an instruction that the jury was to determine the voluntariness of the defendant's confession. (*People* v. *Gonzales, supra,* 24 Cal.2d at pp. 877-878.) In *Rogers,* we found an instruction on corpus delicti to be prejudicial error (*People* v. *Rogers, supra,* 22 Cal.2d at pp. 806-808)— expressly noting that the defendant had "not challenged" the "admissibility" of his confessions "upon any ground which required a ruling as to whether they had been freely or voluntarily made, and the trial judge evidently did not determine this of his own motion" (*id.* at p. 798). In *Ferdinand,* we held harmless what we assumed to be the erroneous refusal to permit defense counsel to examine a witness on voir dire concerning the circumstances of the confession of one of the defendants. (*People* v. *Ferdinand, supra,* 194 Cal. at pp. 565-570.)

In *People* v. *Jones* (1944) 24 Cal.2d 601 [150 P.2d 801]—contrary to the majority's assertion—we did indeed apply a rule of automatic reversal, but apparently that of the United States Constitution and not California law. At the beginning of our discussion therein, after relating the facts, we observed that the evidence other than the defendant's confession was "clearly insufficient" to establish guilt. (*Id.* at p. 604.) But at the end, before proceeding to disposition, we held: " 'The Constitution of the United States stands as a bar

indeed "never expressly *divorced* from federal law." (Italics added.) That is because it was never *married* to it in the first place.

against the conviction of any individual in an American Court by means of a coerced confession. . . .' " (*Id.* at p. 611, quoting *Ashcraft* v. *Tennessee* (1944) 322 U.S. 143, 155 [88 L.Ed. 1192, 1200, 64 S.Ct. 921].)

In *People* v. *Stroble* (1951) 36 Cal.2d 615 [226 P.2d 330], by contrast, we concluded that the *federal constitutional* rule of automatic reversal did not apply on the peculiar facts of that case—erroneously, it turns out. In affirming a judgment of death therein, we "assume[d]" that the first of at least six confessions made by the defendant was coerced. (*Id.* at p. 623.) We then recognized that the "introduction in evidence of such a confession . . . would offend the due process clause of the Fourteenth Amendment" and require automatic reversal. (*Ibid.*) Nevertheless, we held that, under the circumstances presented, the "use of the first confession could not have affected the fairness of defendant's trial, because defendant thereafter made at least five confessions, of materially similar substance and unquestioned admissibility, which were put in evidence." (*Ibid.*)

On certiorari, the United States Supreme Court affirmed *sub nomine Stroble* v. *California, supra,* 343 U.S. 181. In doing so, however, it rejected our assumption that the first confession was coerced: "[W]e are unable to say that [this] confession . . . was the result of coercion . . . ." (*Id.* at p. 191 [96 L.Ed. at p. 191].) But it also rejected our holding that automatic reversal could have been avoided: "If th[is] confession . . . was in fact involuntary, the conviction cannot stand . . . ." (*Id.* at p. 190 [96 L.Ed. at p. 191].)

In a related effort to diminish the authority of our rule, the majority effectively criticize *Berve* and its progeny for not discussing our allegedly "numerous" decisions subjecting the admission of coerced confessions to harmless-error analysis. But as shown, there was practically nothing to discuss. The exception, of course, is *People* v. *Stroble, supra,* 36 Cal.2d 615. After the United States Supreme Court declared on certiorari that our use of harmless-error analysis therein was erroneous, what was left for us to say?

In a further effort to diminish the authority of our rule, the majority again set up and knock down their straw man, confusing this rule requiring automatic reversal for the admission of a coerced confession with its rationale resting on the policy of fairness in the contest between the government and the individual—which is at issue here—and the derivative and broader rule that treats as reversible per se the introduction of *any* confession violative of the United States Constitution with *its* rationale depending on considerations regarding the inherent evidentiary force of confessions as such—which is not at issue. As a result, the majority imply that *Berve* and its

progeny "did not suggest that the . . . admission of a [coerced] confession . . . deprived the defendant of the 'orderly legal process' constituting a fair trial," but instead reasoned that such a confession " 'almost invariably' plays" a "significant role" "in any criminal trial in which it is introduced." (Maj. opn., *ante*, at p. 502.) That is simply not the case. In *Berve* we made the point plain: The admission of a coerced confession "constitutes a denial of due process of law . . . under the . . . state Constitution[] requiring a reversal of the conviction although other evidence may be consistent with guilt" solely because the presence of such a confession " 'offend[s] the community's sense of fair play and decency.' " (*People* v. *Berve, supra,* 51 Cal.2d at p. 290, quoting *Rochin* v. *California, supra,* 342 U.S. at p. 173 [96 L.Ed.2d at pp. 190-191].)

### III. FULMINANTE AND ITS EFFECTS

What the majority label an "appropriate opportunity" (maj. opn., *ante,* at p. 500) for their ill-conceived abandonment of the California rule of automatic reversal for the admission of a coerced confession—but what is perhaps in fact merely a convenient excuse—is the United States Supreme Court's recent decision in *Arizona* v. *Fulminante, supra,* 499 U.S. 279. The reasoning and result of that case demand our close examination.

In *Fulminante,* the defendant was indicted in Arizona for the first degree murder of his 11-year-old stepdaughter. Prior to trial in the Arizona Superior Court, he moved to suppress a confession he had made on the ground that it was inadmissible because coerced in violation of his rights under the United States Constitution, effectively including the Fifth Amendment privilege against self-incrimination. He was unsuccessful. The confession was then admitted at trial. The defendant was subsequently convicted of first degree murder and sentenced to death. On appeal, the Arizona Supreme Court reversed. It held that the confession was in fact coerced contrary to federal constitutional law. It also held that under that same law its admission required automatic reversal.

On certiorari, the United States Supreme Court affirmed. Its discussion consists of four parts: (1) a description of the facts; (2) whether the confession was inadmissible under the United States Constitution because coerced; (3) whether the admission of a coerced confession remains automatically reversible under the federal charter or is to be subject to harmless-error analysis pursuant to *Chapman*; and (4) whether the admission of the confession there was prejudicial.

The *Fulminante* court was widely fragmented and deeply divided. Justice White delivered an opinion, which was for the court as to: (1) the description

of the facts, in which Justices Marshall, Blackmun, Stevens, Scalia, and Kennedy joined; (2) the conclusion that the confession was in fact inadmissible under the United States Constitution because coerced, in which Justices Marshall, Blackmun, Stevens, and Scalia joined; and (3) the holding that the admission of the confession there was prejudicial, in which Justices Marshall, Blackmun, Stevens, and Kennedy joined. Chief Justice Rehnquist delivered an opinion, which was for the court as to the conclusion that the admission of a coerced confession is no longer automatically reversible under the federal charter but is henceforth subject to harmless-error analysis, in which Justices O'Connor, Scalia, Kennedy, and Souter joined. Justice White filed an opinion dissenting from the purported abrogation of the rule of automatic reversal, in which Justices Marshall, Blackmun, and Stevens joined. Chief Justice Rehnquist filed an opinion dissenting as to coercion, in which Justices O'Connor, Kennedy, and Souter joined. He also filed an opinion dissenting as to prejudice, in which Justices O'Connor and Scalia joined. Justice Kennedy filed an opinion concurring in the judgment, explaining why he joined which parts of the foregoing opinions, including his views to the effect that there was prejudice but no error.

The first question that arises is whether Chief Justice Rehnquist's opinion purportedly abrogating the federal constitutional rule of automatic reversal controls the issue before this court. The answer is negative.

What we shall assume to be the "authoritativeness" of Chief Justice Rehnquist's opinion extends only to the United States Constitution. The determination here concerns California law. In this area, of course, we are the final arbiters. (Cf. *Allen* v. *Superior Court* (1976) 18 Cal.3d 520, 525 [134 Cal.Rptr. 774, 557 P.2d 65] ["[O]ur Constitution is 'a document of independent force' [citations], 'whose construction is left to this court, informed but untrammeled by the United States Supreme Court's reading of parallel federal provisions. [Citations.]' "].) We must shoulder the responsibility. (See Stevens, *The Bill of Rights: A Century of Progress* (1992) 59 U. Chi. L.Rev. 13, 16 fn. 9 [implying that "state supreme courts" may "look to their state constitutions" and statutory and decisional law "to hold that 'a coerced confession may so infect the trial process that its admission into evidence demands reversal' and that the admission of a coerced confession is not subject to harmless error analysis"].)

In passing, however, we may observe that, at first glance, the "authoritativeness" of Chief Justice Rehnquist's opinion appears minimal. The weight to be accorded to his views must be reduced—to borrow words he wrote in another case—by reason of the fact that they prevailed "by the narrowest of margins, over [a] spirited dissent[] challenging the[ir] basic underpinnings

. . . ." (*Payne* v. *Tennessee* (1991) 501 U.S. __, __ [115 L.Ed.2d 720, 737-739, 111 S.Ct. 2597, 2611] (per Rehnquist, C. J.).) The weight of his views must be reduced still further because of the strong criticism they have justifiably provoked. (See, e.g., Ogletree, Arizona v. Fulminante: *The Harm of Applying Harmless Error to Coerced Confessions* (1991) 105 Harv. L.Rev. 152, 152-154, 161-175 [hereafter Ogletree].)

When we look more closely, we come to realize that the "authoritativeness" of Chief Justice Rehnquist's opinion is actually nonexistent. The relevant discussion, which is manifestly unnecessary to the court's judgment, is dictum. The Chief Justice later expressly admitted as much, making a virtue of necessity. (Rehnquist, C. J., Review of Major Supreme Court Decisions—October, 1990 Term (June 28, 1991) Sixty-first Judicial Conference for United States Judges of the Fourth Circuit, vol. I, p. 19 [conceding that the discussion "may be technically dicta [*sic*]"].)

The second question that arises is whether Chief Justice Rehnquist's opinion is persuasive as to the issue before this court. Here too, the answer is negative.

In purportedly abrogating the federal constitutional rule of automatic reversal, Chief Justice Rehnquist lays a foundation that assumes that the United States Constitution is concerned only with the reliability of the outcome of an individual criminal trial and not at all with the legitimacy of the criminal justice system itself. (See *Arizona* v. *Fulminante, supra*, 499 U.S. at p. 308 [113 L.Ed.2d at pp. 330-331, 111 S.Ct. at p. 1264] (opn. of Rehnquist, C. J.).) As a result, he builds on sand.

Chief Justice Rehnquist then suggests that the federal constitutional rule of automatic reversal never existed, or at least has not existed since *Chapman*. (See *Arizona* v. *Fulminante, supra*, 499 U.S. at p. 308 [113 L.Ed.2d at pp. 330-331, 111 S.Ct. at p. 1264] (opn. of Rehnquist, C. J.).) The implication is astonishing. Recall that *Chapman* expressly excepted from harmless-error analysis the admission of a coerced confession, citing to *Payne*. (*Chapman* v. *California, supra*, 386 U.S. at p. 23 & fn. 8 [17 L.Ed.2d at p. 710].) *Chapman* was followed impliedly by *Lego* v. *Twomey, supra*, 404 U.S. at page 483 [30 L.Ed.2d at pages 623-624], *Mincey* v. *Arizona, supra*, 437 U.S. at page 398 [57 L.Ed.2d at pages 303-304], and *New Jersey* v. *Portash, supra*, 440 U.S. at page 459 [59 L.Ed.2d at page 510]; it was followed expressly by *United States* v. *Hasting, supra*, 461 U.S. at page 508, footnote 6 [76 L.Ed.2d at pages 105-106]. Recall also that *Chapman* was adhered to in, and in fact reaffirmed by, *Clark*. (*Rose* v. *Clark, supra*, 478 U.S. at pp. 577-578 & fn. 6 [92 L.Ed.2d at pp. 470-471].) The Chief Justice sets out to

show that *Chapman* is dictum and that *Payne* does not stand for the proposition cited. He runs squarely into the facts, which do not yield. (See *Arizona v. Fulminante, supra,* 499 U.S. at p. 290 [113 L.Ed.2d at pp. 318-319, 111 S.Ct. at p. 1254] (dis. opn. of White, J.).) In addition, he ignores all the decisions that prove him wrong. The omission speaks for itself.

Chief Justice Rehnquist proceeds to declare that the question whether a federal constitutional error is automatically reversible or, instead, is subject to harmless-error analysis under *Chapman* depends on the following crucial distinction.

On one side, there is what he labels " 'trial error,' " which "occur[s] during the presentation of the case to the jury, and which may therefore be quantitatively assessed . . . in order to determine whether [it] was harmless beyond a reasonable doubt." (*Arizona v. Fulminante, supra,* 499 U.S. at pp. 307-308 [113 L.Ed.2d at pp. 330-331, 111 S.Ct. at p. 1264] (opn. of Rehnquist, C. J.).) Here, assertedly, belongs the admission of a coerced confession, a "classic 'trial error[.]' " (*Id.* at p. 309 [113 L.Ed.2d at pp. 330-331, 111 S.Ct. at p. 1264] (opn. of Rehnquist, C. J.).)

On the other, there are what he calls "structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards." (*Arizona v. Fulminante, supra,* 499 U.S. at pp. 309-310 [113 L.Ed.2d at pp. 331-332, 111 S.Ct. at p. 1265] (opn. of Rehnquist, C. J.).) Here, assertedly, belong, inter alia, the "total deprivation of the right to counsel at trial," the participation of a "judge who was not impartial," the "unlawful exclusion of members of the defendant's race from a grand jury," the denial of the "right to self-representation at trial," and the deprivation of the "right to public trial." (*Id.* at p. 310 [113 L.Ed.2d at pp. 331-332, 111 S.Ct. at p. 1265] (opn. of Rehnquist, C. J.).) Each of these flaws "affect[s]" the "entire conduct of the trial from beginning to end" or the "framework within which the trial proceeds." (*Id.* at p. 310 [113 L.Ed.2d at pp. 331-332, 111 S.Ct. at p. 1265] (opn. of Rehnquist, C. J.).) " 'Without these basic protections, a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair.' " (*Id.* at p. 310 [113 L.Ed.2d at pp. 331-332, 111 S.Ct. at p. 1265] (opn. of Rehnquist, C. J.), quoting without internal citation *Rose v. Clark, supra,* 478 U.S. at pp. 577-578 [92 L.Ed.2d at pp. 470-471.)

Chief Justice Rehnquist's crucial distinction "fails." (*Arizona v. Fulminante, supra,* 499 U.S. at p. 291 [113 L.Ed.2d at pp. 319-320, 111 S.Ct. at p. 1255] (dis. opn. of White, J.).) His dichotomy, it may be noted, "has no support in precedent." (Ogletree, *supra,* 105 Harv. L.Rev. at p. 164.) And that is the least of its weaknesses.

To begin with, the distinction simply does not work. The omission of an instruction on the prosecution's burden of proof beyond a reasonable doubt is, in Chief Justice Rehnquist's words, a "classic 'trial error[.]' " (*Arizona* v. *Fulminante, supra*, 499 U.S. at p. 309 [113 L.Ed.2d at pp. 330-331, 111 S.Ct. at p. 1264] (opn. of Rehnquist, C. J.).) Nevertheless, it requires automatic reversal. (*Jackson* v. *Virginia* (1979) 443 U.S. 307, 320, fn. 14 [61 L.Ed.2d 560, 574, 99 S.Ct. 2781].)[9] By contrast, the denial of a criminal defendant's right to be personally present at his own trial is surely as much a "structural defect" as the denial of his right to represent himself. Indeed, it would "strain[] credulity" to assert otherwise. (Ogletree, *supra*, 105 Harv. L.Rev. at p. 164.) All the same, denial of the right of personal presence is deemed subject to harmless-error analysis. (*Rushen* v. *Spain* (1983) 464 U.S. 114, 117-118 [78 L.Ed.2d 267, 272-273, 104 S.Ct. 453] (*per curiam*).)

Perhaps more important, the distinction is "meaningless." (*Arizona* v. *Fulminante, supra*, 499 U.S. at p. 290 [113 L.Ed.2d at pp. 318-319, 111 S.Ct. at p. 1254] (dis. opn. of White, J.).) Chief Justice Rehnquist "never clearly articulates the structure that the structural errors undermine." (Ogletree, *supra*, 105 Harv. L.Rev. at p. 164.) In fact, he never articulates that "structure" at all.

If we consider, as it were, the modern form of a criminal trial, we would conclude that the admission of a coerced confession is as great a "structural defect" as, say, the exclusion from a grand jury of persons of the same race as the defendant. The latter may have no effect whatsoever on any part or aspect of the trial. The former, however, "distorts the trial process" itself (Ogletree, *supra*, 105 Harv. L.Rev. at p. 166), seeing that it is substantially an extrajudicial plea of guilty.

If we look more deeply to the traditional substance of a criminal trial, we would come to the same conclusion. The bar against the admission of a coerced confession (see *Bram* v. *United States, supra*, 168 U.S. at pp. 542-543 [42 L.Ed. at pp. 573-574]) and the prohibition of the exclusion of same-race persons from a grand jury (see *Strauder* v. *West Virginia* (1880) 100 U.S. (10 Otto 303) 303, 305-310 [25 L.Ed. 664, 664-666]) are coeval, each dating to the 19th century.

---

[9]The giving of a reasonable-doubt instruction that is merely "deficient" under the United States Constitution is arguably an even more "classic 'trial error.' " Yet in *Sullivan* v. *Louisiana* (1993) __ U.S. __, __-__ [124 L.Ed.2d 182, 189], the United States Supreme Court unanimously held that it requires automatic reversal. Chief Justice Rehnquist concurred in the opinion of the court. Writing separately, he made a transparently unsuccessful attempt to square his vote with the "trial error/structural defect" distinction he had earlier created in *Fulminante*. (*Sullivan* v. *Louisiana, supra*, __ U.S. at pp. __-__ [124 L.Ed.2d at pp. 191-192] (conc. opn. of Rehnquist, C. J.).) His failure demonstrates that the distinction is specious.

Shorn of its analytical trappings, Chief Justice Rehnquist's discussion reduces itself to this: a confession *looks* like "ordinary" evidence; and the admission of a coerced confession *looks* like the kind of error that may appropriately be subject to harmless-error analysis. Appearance, however, is not reality. As stated, a confession is evidence sui generis, being substantially an extrajudicial plea of guilty. Further, as explained, harmless-error analysis is designed to assess threats to the reliability of the outcome of an individual criminal trial; it does not even take cognizance of the injury peculiar to the introduction of a coerced confession, which is the undermining of fairness in the contest between the government and the individual and, ultimately, the legitimacy of the criminal justice system itself.

At bottom, it becomes manifest, Chief Justice Rehnquist holds a "belief that there is [nothing] more 'fundamental' about involuntary confessions" than about other statements inadmissible under the United States Constitution, which are indeed subject to harmless-error analysis. (*Arizona* v. *Fulminante, supra,* 499 U.S. at p. 311 [113 L.Ed.2d at pp. 331-332, 111 S.Ct. at p. 1265] (opn. of Rehnquist, C. J.).) We need not engage in protracted argument on the point. Our constitutional history demonstrates that such a belief is unsound.

"The search for truth," as Justice White observes, "is indeed central to our system of justice, but 'certain constitutional rights are not, and should not be, subject to harmless-error analysis because those rights protect important values that are unrelated to the truth-seeking function of the trial.' [Citation.] The right of a defendant not to have his coerced confession used against him is among those rights, for using a coerced confession 'abort[s] the basic trial process' and 'render[s] a trial fundamentally unfair.' " (*Arizona* v. *Fulminante, supra,* 499 U.S. at p. 295 [113 L.Ed.2d at pp. 321-322, 111 S.Ct. at p. 1257] (dis. opn. of White, J.), quoting *Rose* v. *Clark, supra,* 478 U.S. at p. 587 [92 L.Ed.2d at pp. 476-477] (conc. opn. of Stevens, J.) and *id.* at pp. 577 & 578, fn. 6 [92 L.Ed.2d at p. 470].)

Having closely considered the question, we must arrive at this conclusion: Chief Justice Rehnquist's opinion furnishes no principled basis on which to reconsider, less still abandon, our rule of automatic reversal in favor of harmless-error analysis.

IV. PRUDENTIAL CONSIDERATIONS

Matters of principle aside for the moment, we should decline to reconsider and abandon the California rule of automatic reversal for the admission of a coerced confession because of purely prudential considerations.

At the threshold, the majority suggest that section 13 of article VI of the California Constitution bars us from taking such considerations into account. They say that the "California constitutional reversible-error provision was adopted for the specific purpose of eliminating . . . a prophylactic approach to reversible error." (Maj. opn., *ante*, at p. 503.) They paint with too broad a brush. As explained, the constitutional provision was *not* intended to abrogate or obviate our rule of automatic reversal for the admission of a coerced confession. It was designed simply to constitutionally preclude a reversal when the error in question is "unimportant" or "purely technical"—unlike the introduction of a coerced confession, which is a profoundly grave defect going to the very heart of a criminal trial.

Let us proceed. The benefits of discarding our rule of automatic reversal are likely to be quite low. Few, if any, judgments could conceivably be salvaged by application of harmless-error analysis.

We must be clear about one point. The standard of prejudice to be applied would be that of the United States Constitution, viz., *Chapman*'s "reasonable doubt" test. That is because the admission of a coerced confession remains (at least for the time being) error of federal constitutional dimension (see *Arizona* v. *Fulminante, supra,* 499 U.S. at pp. 284-289 [113 L.Ed.2d at pp. 314-318, 111 S.Ct. at pp. 1251-1253] (opn. of White, J.)) as well as error under state law.

*Chapman,* it need not be emphasized, is intolerant and unforgiving of error. "The California constitutional [harmless-error] rule emphasizes 'a miscarriage of justice,' but the California courts"—and the majority are in accord (see maj. opn., *ante,* at pp. 508-509)—"have neutralized this to some extent by emphasis, and perhaps overemphasis, upon the court's view of 'overwhelming evidence.' We prefer the approach of this Court in deciding what was harmless error in our recent case of *Fahy* v. *Connecticut,* 375 U.S. 85 [11 L.Ed.2d 171, 84 S.Ct. 229] [(1963)]. There we said: 'The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' . . . [T]his statement in *Fahy* . . . emphasizes an intention not to treat as harmless those constitutional errors that 'affect substantial rights' of a party. An error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot, under *Fahy,* be conceived of as harmless. Certainly error, constitutional error, in illegally admitting highly prejudicial evidence . . . , casts on someone other than the person prejudiced by it a burden to show that it was harmless. . . . There is little, if any, difference between our statement in *Fahy* v. *Connecticut* about 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction' and

requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. We, therefore, do no more than adhere to the meaning of our *Fahy* case when we hold, as we now do, that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (*Chapman* v. *California, supra,* 386 U.S. at pp. 23-24 [17 L.Ed.2d at pp. 710-711], fns. omitted.)

In *Yates* v. *Evatt* (1991) 500 U.S. __ [114 L.Ed.2d 432, 111 S.Ct. 1884], and *Sullivan* v. *Louisiana, supra,* __ U.S. __ [124 L.Ed.2d 182], which were decided after *Fulminante,* the United States Supreme Court provided the following explanation.

"The *Chapman* test is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " (*Yates* v. *Evatt, supra,* 500 U.S. at p. __ [114 L.Ed.2d at pp. 447-448, 111 S.Ct. at p. 1892]; accord, *Sullivan* v. *Louisiana, supra,* __ U.S. at pp. __-__ [124 L.Ed.2d at p. 189].) "To say that an error did not contribute to the verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question . . . ." (*Yates* v. *Evatt, supra,* 500 U.S. at p. __ [114 L.Ed.2d at pp. 448-449, 111 S.Ct. at p. 1893]; accord, *Sullivan* v. *Louisiana, supra,* __ U.S. at p. __ [124 L.Ed.2d at p. 189].)

The focus under *Chapman* is what the jury actually decided and whether the error may have tainted its decision. "[T]he issue . . . is whether the jury actually rested its verdict on evidence [and instructions] . . . , independently of the" error. (*Yates* v. *Evatt, supra,* 500 U.S. at p. __ [114 L.Ed.2d at pp. 448-449, 111 S.Ct. at p. 1893].) Stated differently, the "question" is "what effect [the error] had upon the guilty verdict in the case at hand." (*Sullivan* v. *Louisiana, supra,* __ U.S. at p. __ [124 L.Ed.2d at p. 189].) Or in still other words, the "inquiry" is "whether the guilty verdict actually rendered in [the] trial was surely unattributable to the error." (*Ibid.*)

As a consequence, the focus under *Chapman* is not what a reviewing court might itself decide on a cold record. "[W]hen it does that, 'the wrong entity judges the defendant guilty.' " (*Sullivan* v. *Louisiana, supra,* __ U.S. at p. __ [124 L.Ed.2d at p. 190], quoting *Rose* v. *Clark, supra,* 478 U.S. at p. 578 [92 L.Ed.2d at pp. 470-471].) By its very terms, *Chapman* precludes such a court from finding harmlessness based simply "upon [its own] view of 'overwhelming evidence.' " (*Chapman* v. *California, supra,* 386 U.S. at p. 23 [17 L.Ed.2d at p. 710].)

Neither is the focus under *Chapman* what a reviewing court might conjecture the jury would have decided in the absence of the error. The "hypothetical inquiry" whether, if the jury had not been exposed to the error, it would

have made the decision it did, "is inconsistent with the harmless-error standard announced in *Chapman* . . . . While such a hypothetical inquiry ensures that the State has, in fact, proved [its case] beyond a reasonable doubt, it does not ensure that it has proved [it] beyond a reasonable doubt *to the satisfaction of a jury.*" (*Yates* v. *Evatt, supra,* 500 U.S. at p. __ [114 L.Ed.2d at pp. 454-455, 111 S.Ct. at p. 1898], italics in original (conc. opn. of Scalia, J.); accord, *Sullivan* v. *Louisiana, supra,* __ U.S. at p. __ [124 L.Ed.2d at p. 188].) "The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered . . . ." (*Sullivan* v. *Louisiana, supra,* __ U.S. at p. __ [124 L.Ed.2d at p. 189].)

Lastly, the focus under *Chapman* is not what a reviewing court might speculate concerning "what effect the . . . error might generally be expected to have upon a reasonable jury . . . ." (*Sullivan* v. *Louisiana, supra,* __ U.S. at p. __ [124 L.Ed.2d at pp. 189-190].) "[M]ore [is required] than appellate speculation about a hypothetical jury's action . . . ." (*Ibid.*)

So long as the admission of a coerced confession remains error of federal constitutional dimension and, as such, subject to the federal constitutional standard of prejudice embodied in *Chapman*'s "reasonable doubt" test, the application of a standard under the California Constitution is a purely academic question. Of course—contrary to what the majority assume—that standard would not necessarily be *Watson*'s "reasonable probability" test. As explained, the state charter does not "expressly or impliedly mandate[] any specific standard of prejudice for any kind of error in any kind of proceeding." (*People* v. *Brown, supra,* 46 Cal.3d at p. 467 (conc. opn. of Mosk, J.).) *Watson* itself simply defined its test as one that was "*generally*" applicable." (*People* v. *Watson, supra,* 46 Cal.2d at p. 836, italics added.) Another test, for example, is the "reasonable possibility" standard of *People* v. *Brown, supra,* 46 Cal.3d 432, 448, which is employed for "state-law error at the penalty phase of a capital trial." The tests of *Brown* and *Chapman* "are the same in substance and effect." (*People* v. *Ashmus* (1991) 54 Cal.3d 932, 965 [2 Cal.Rptr.2d 112, 820 P.2d 214].)

The standard of prejudice to be applied would probably matter little. On one point at least, *Schader*'s dictum is sound and indeed convincing: a "confession operates as a kind of evidentiary bombshell which shatters the defense." (*People* v. *Schader, supra,* 62 Cal.2d at p. 731.) At oral argument, the People expressly conceded that a "confession will be a bombshell most of the time." As Justice Kennedy elaborated in *Fulminante*: a "confession may have" an "indelible impact" "on the trier of fact, as distinguished, for instance, from the impact of an isolated statement that incriminates the

defendant only when connected with other evidence. If the jury believes that a defendant has admitted the crime, it doubtless will be tempted to rest its decision on that evidence alone, without careful consideration of the other evidence in the case. Apart, perhaps, from a videotape of the crime, one would have difficulty finding evidence more damaging to a criminal defendant's plea of innocence." (*Arizona* v. *Fulminante, supra*, 499 U.S. at pp. 313-314 [113 L.Ed.2d at pp. 332-334, 111 S.Ct. at pp. 1266-1267] (conc. opn. of Kennedy, J.).) Under *Watson*, the admission of a coerced confession would almost always be prejudicial. The majority's bald assertion that "in many instances" the error would be harmless blinks reality. (Maj. opn., *ante*, p. 505.) Under *Chapman*, prejudice would be found a fortiori. It is scarcely conceivable that such a confession could be found "*unimportant* in relation to everything else the jury considered . . . ." (*Yates* v. *Evatt, supra*, 500 U.S. at p. ___ [114 L.Ed.2d at pp. 448-449, 111 S.Ct. at p. 1893], italics added.) In this case, for example, the prosecutor deliberately introduced a coerced confession. He did not consider it "unimportant." Neither could the jury. That, of course, is the very reason that admission of a coerced confession cannot be deemed harmless. Indeed, harmless coercion is a true oxymoron.

Although the benefits of discarding our rule of automatic reversal are likely to be quite low, the costs are surely to be very high.

An application of harmless-error analysis would have a "corrosive impact on the administration of criminal justice." (*Rose* v. *Clark, supra*, 478 U.S. at p. 588 [92 L.Ed.2d at pp. 477-478] (conc. opn. of Stevens, J.).) It "can only encourage prosecutors to subordinate the interest in respecting" the law "to the ever-present and always powerful interest in obtaining a conviction in a particular case." (*Id.* at pp. 588-589 [92 L.Ed.2d at pp. 477-478] (conc. opn. of Stevens, J.); cf. *Berger* v. *United States* (1935) 295 U.S. 78, 88 [79 L.Ed. 1314, 1321, 55 S.Ct. 629] [stating that the prosecutor "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done"].) Similarly, it can only invite courts—ours included—to favor an allegedly "efficient" processing of cases with a view toward the "reliability" of the outcome of an individual criminal trial over the doing of justice in order to preserve the legitimacy of the criminal justice system itself.

As our analysis reaches its end, I recognize that the course I would take—to adhere to our rule of automatic reversal—might conceivably produce the "effect of eroding . . . confidence in the criminal justice system"

(maj. opn., *ante*, at p. 509) among those persons in our midst who want convictions to be upheld regardless of the cost to law and morality. But the course the majority have taken—to abandon our rule—will surely produce a similar effect among those thoughtful members of society who desire justice to be done above all. When the matter is presented thus, the better path is clear.

## V. CONCLUSION

On the many pages that have preceded, much has been written. All those words, however, add up only to this: There is no reason to abandon or even to reconsider the well- and long-settled California rule of automatic reversal for the admission of a coerced confession. I would not. I shall not.

**KENNARD, J.,** Dissenting.—I do not agree that the erroneous admission of a criminal defendant's coerced confession may be excused as harmless. When law enforcement officers have resorted to physical or mental abuse or other improper pressure tactics to extort a confession from an unwilling suspect, the values at stake—respect for the dignity and autonomy of the individual, and for the inviolability of the human personality—are too important to relegate to the uncertain protection afforded by any harmless error standard.

For some 200 years, courts in England and the United States have refused to allow prosecutors to prove criminal charges by means of confessions obtained by coercion. Originally, the basis of the rule was that coerced confessions were unreliable because an innocent person may confess falsely to escape intolerable pain and misery. (See 1 McCormick on Evidence (4th ed. 1992) § 146, p. 564; Paulsen, *The Fourteenth Amendment and the Third Degree* (1954) 6 Stan.L.Rev. 411, 414.) But for many years now untrustworthiness has ceased to be the primary reason that this country's courts give for excluding coerced confessions. (See *Colorado* v. *Connelly* (1986) 479 U.S. 157, 167 [93 L.Ed.2d 473, 484-485, 107 S.Ct. 515]; *Rogers* v. *Richmond* (1961) 365 U.S. 534, 543-544 [5 L.Ed.2d 760, 767-768, 81 S.Ct. 735]; *People* v. *Ditson* (1962) 57 Cal.2d 415, 436-439 [20 Cal.Rptr. 165, 369 P.2d 714].) Such confessions, regardless of their truth, are barred from evidence because the means used to obtain them is fundamentally irreconcilable with the Anglo-American system of justice.

Chief Justice Earl Warren put it this way: "The abhorrence of society to the use of involuntary confessions does not turn alone on their inherent untrustworthiness. It also turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty

can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves." (*Spano* v. *New York* (1959) 360 U.S. 315, 320-321 [3 L.Ed.2d 1265, 1269-1271, 79 S.Ct. 1202].) Stated another way, " 'the considerations which call for the exclusion of a coerced confession are those which call for the protection of every citizen, whether he be in fact guilty or not guilty.' " (*Jackson* v. *Denno* (1964) 378 U.S. 368, 382-383, fn. 10 [12 L.Ed.2d 908, 918-919, 84 S.Ct. 1774, 1 A.L.R.3d 1205].)

Perhaps not coincidentally, the realization that exclusion of coerced confessions served to preserve core democratic values in this country took hold at a time when modern police states denying the dignity and worth of the individual were arising in other parts of the world. This contrast between the ideals of a free society and the practices of totalitarian forms of government has been expressly noted by the United States Supreme Court: "The Constitution of the United States stands as a bar against the conviction of any individual in an American court by means of a coerced confession. There have been, and are now, certain foreign nations with governments dedicated to an opposite policy: governments which convict individuals with testimony obtained by police organizations possessed of an unrestrained power to seize persons suspected of crimes against the state, hold them in secret custody, and wring from them confessions by physical or mental torture. So long as the Constitution remains the basic law of our Republic, America will not have that kind of government." (*Ashcraft* v. *Tennessee* (1944) 322 U.S. 143, 155 [88 L.Ed. 1192, 1200, 64 S.Ct. 921], fn. omitted; see also, *United States* v. *Grunewald* (2d Cir. 1956) 233 F.2d 556, 581-582 (dis. opn. of Frank, J.), revd. 353 U.S. 391 (1957) [1 L.Ed.2d 931].)

In a more reflective vein, United States Supreme Court Justice Frankfurter has explained why coercive police practices such as prolonged and relentless interrogation, food and sleep deprivation, sensory and physical isolation, and similar human indignities are incompatible with the Anglo-American system of criminal justice: "To turn the detention of an accused into a process of wrenching from him evidence which could not be extorted in open court with all its safeguards, is so grave an abuse of the power of arrest as to offend the procedural standards of due process. [¶] This is so because it violates the underlying principle in our enforcement of the criminal law. Ours is the accusatorial as opposed to the inquisitorial system. Such has been the characteristic of Anglo-American criminal justice since it freed itself from practices borrowed by the Star Chamber from the Continent whereby an accused was interrogated in secret for hours on end. [Citation.] Under our system society carries the burden of proving its charge against the accused not out of his own mouth. It must establish its case, not by interrogation of

the accused even under judicial safeguards, but by evidence independently secured through skillful investigation. 'The law will not suffer a prisoner to be made the deluded instrument of his own conviction.' 2 Hawkins, Pleas of the Crown, c. 46, § 34 (8th ed., 1824). The requirement of specific charges, their proof beyond a reasonable doubt, the protection of the accused from confessions extorted through whatever form of police pressures, the right to a prompt hearing before a magistrate, the right to assistance of counsel, to be supplied by government when circumstances make it necessary, the duty to advise an accused of his constitutional rights—these are all characteristics of the accusatorial system and manifestations of its demands. Protracted, systematic and uncontrolled subjection of an accused to interrogation by the police for the purpose of eliciting disclosures or confessions is subversive of the accusatorial system. It is the inquisitorial system without its safeguards. For while under that system the accused is subjected to judicial interrogation, he is protected by the disinterestedness of the judge in the presence of counsel. [Citation.]." (*Watts* v. *Indiana* (1949) 338 U.S. 49, 54-55 [93 L.Ed. 1801, 1806-1807, 69 S.Ct. 1347]; see also, *Miller* v. *Fenton* (1985) 474 U.S. 104, 110 [88 L.Ed.2d 405, 410-411, 106 S.Ct. 445].)

Because the use of coerced confessions is irreconcilable with our system of justice, such use constitutes a denial of due process of law under both the federal and state Constitutions. (U.S. Const., 14th Amend.; Cal. Const., art. I, § 15; *Miller* v. *Fenton, supra,* 474 U.S. 104, 109-110 [88 L.Ed.2d at pp. 410-411]; *Jackson* v. *Denno, supra,* 378 U.S. 368, 376-377 [12 L.Ed.2d at pp. 915-916]; *Watts* v. *Indiana, supra,* 338 U.S. 49, 54 [93 L.Ed.2d at p. 1806]; *People* v. *Benson* (1990) 52 Cal.3d 754, 778 [276 Cal.Rptr. 827, 802 P.2d 330]; *People* v. *Sanchez* (1969) 70 Cal.2d 562, 571 [75 Cal.Rptr. 642, 451 P.2d 74]; *People* v. *Ditson, supra,* 57 Cal.2d 415, 439; *People* v. *Trout* (1960) 54 Cal.2d 576, 583 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418]; *People* v. *Berve* (1958) 51 Cal.2d 286, 290 [332 P.2d 97].) Indeed, the due process clause bars all police methods of evidence gathering that "shock[] the conscience" and are "offensive to human dignity." (*Rochin* v. *California* (1952) 342 U.S. 165, 172, 174 [96 L.Ed. 183, 190-191, 72 S.Ct. 205, 25 A.L.R.2d 1396].) When faced with evidence that police in this state, seeking to recover capsules they believed to be illegal drugs, had forced a suspect to vomit, the United States Supreme Court in *Rochin* recognized the parallel to its earlier rulings barring use of coerced confessions: "It would be a stultification of the responsibility which the course of constitutional history has cast upon this Court to hold that in order to convict a man the police cannot extract by force what is in his mind but can extract what is in his stomach. [Fn. omitted.]" (*Id.* at p. 173 [96 L.Ed.2d at pp. 190-191].) To permit use of either form of coerced evidence against the accused "would be to afford brutality the cloak of law. Nothing would be more calculated to

discredit law and thereby to brutalize the temper of a society." (*Id.* at pp. 173-174 [96 L.Ed.2d at pp. 190-191].)

As the realization grew among the judiciary that the use of coerced confessions violated the most cherished values of our democratic system of justice, it became widely accepted that error of such fundamental importance could never be harmless. (See *People* v. *Speaks* (1957) 156 Cal.App.2d 25, 40 [319 P.2d 709] ["The complaint is not of the commission of mere error, but of a wrong so fundamental that it rendered the conviction wholly void."].) This has long been the California rule, often repeated and often applied. (See, e.g., *People* v. *Sanchez, supra,* 70 Cal.2d 562, 576-577; *People* v. *Matteson* (1964) 61 Cal.2d 466, 469-470 [39 Cal.Rptr. 1, 393 P.2d 161]; *People* v. *Brommel* (1961) 56 Cal.2d 629, 634 [15 Cal.Rptr. 909, 364 P.2d 845]; *People* v. *Trout, supra,* 54 Cal.2d 576, 585; *People* v. *Berve, supra,* 51 Cal.2d 286, 290; *People* v. *Hinds* (1984) 154 Cal.App.3d 222, 241 [201 Cal.Rptr. 104]; *People* v. *Rodriguez* (1943) 58 Cal.App.2d 415, 425 [136 P.2d 626].)

There are several reasons why the rule should be acknowledged and applied in this case, not all of which are of equal weight.

First, the rule of automatic reversal is existing California law. Under the doctrine of stare decisis,[1] which "expresses a fundamental policy of common law jurisdictions" and promotes "certainty, predictability and stability in the law" (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 758, p. 726), this court should ordinarily adhere to rules declared in its own prior decisions. "Without a proper adherence to the rule [of stare decisis], no certainty of adjudication can ever be attained, and confusion and doubt must invariably follow every change of the Bench that occurs by death or otherwise." (*People* ex rel. *Vermule* v. *Bigler* (1855) 5 Cal. 23, 25 (separate opn. of Murray, C. J.).) Stare decisis "permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals, and thereby contributes to the integrity of our constitutional system of government, both in appearance and in fact." (*Vasquez* v. *Hillery* (1986) 474 U.S. 254, 265-266 [88 L.Ed.2d 598, 610-611, 106 S.Ct. 617].) Stability in the law is specially needed when, as in the treatment of coerced confessions, the rule at issue affects fundamental rights and democratic values that define the nature of our society.

A change in course by the United States Supreme Court, interpreting the federal Constitution, is no justification for a change in this court's interpretation of the distinct provisions of our state Constitution. This court should

---

[1]"Stare decisis, et non quieta movere, meaning 'to adhere to precedents, and not to unsettle things which are established,' is one of the most important maxims of the law." (Sunderlin, *Stare Decisis* (1939) 14 State Bar J. 175.)

disabuse itself of the notion that in matters of constitutional law and criminal procedure we must always play Ginger Rogers to the high court's Fred Astaire—always following, never leading. The rights guaranteed by the state Constitution "are not dependent on those guaranteed by the United States Constitution." (Cal. Const., art. I, § 24; see *Raven* v. *Deukmejian* (1990) 52 Cal.3d 336, 351-355 [276 Cal.Rptr. 326, 801 P.2d 1077].) We have the power and the duty to give independent meaning and force to the provisions of our state charter.

Second, automatic reversal prevents erosion of the harmless error standard. Faced with a record containing persuasive but not overwhelming evidence that the accused is guilty of a repulsive crime, the urge to uphold the conviction, so that the crime may not go unpunished, is difficult to resist. It has become increasingly apparent that this court, in particular, is not immune to the siren song of harmless error. (See, e.g., *In re Jackson* (1992) 3 Cal.4th 578, 617 [11 Cal.Rptr.2d 531, 835 P.2d 371] (dis. opn. of Mosk, J.); *In re Marquez* (1992) 1 Cal.4th 584, 610 [3 Cal.Rptr.2d 727, 822 P.2d 435] (dis. opn. of Kennard, J.).) Abandoning the automatic reversal rule for erroneous use of coerced confessions will require California appellate courts to apply a harmless error standard to a class of cases in which conscientious application of the standard should almost invariably lead to reversal of the conviction. This will multiply the occasions in which courts are tempted to apply the standard disingenuously in order to save the conviction of an apparently guilty defendant. The probable result, I fear, is that the doctrine of harmless error will be repeatedly stretched beyond the breaking point. Distorted and degraded in this way, the standard will cease to provide meaningful guidance for appellate courts.

Third, compelling reversal whenever the trial court has failed to exclude a defendant's coerced confession is a simple bright-line rule that conserves appellate resources. The rule saves a reviewing court the labor of searching the trial record to evaluate the probable effect of the unconstitutional evidence on the jury's verdict. The vast majority of convictions, as the majority acknowledges, will not survive such scrutiny in any event. By avoiding case-by-case prejudice evaluations, automatic reversal for coerced confessions "simplifies and expedites the review of criminal cases, for evidence obtained at the expense of constitutional or other basic guarantees is almost invariably prejudicial." (Gibbs, *Prejudicial Error: Admissions and Exclusions of Evidence in the Federal Courts* (1957) 3 Vill. L.Rev. 48, 68.)

Fourth, abandoning the rule of automatic reversal sends the wrong signal to police, to prosecutors, and to trial courts.

The rule that the admission of a coerced confession results inexorably in the reversal of a conviction has served to impress upon the police the judiciary's resolve that the use of overbearing tactics to secure a confession will not be tolerated. Abrogation of that stern rule, which has been in force for so long, will give an impression to those charged with the arduous daily challenge of law enforcement that courts are taking a somewhat more indulgent view of abusive interrogation practices.

For prosecutors the question normally is not whether to employ coercive methods in questioning an accused, but whether to offer in evidence a confession obtained by such methods. If the rule of automatic reversal is abandoned, "the problem for the prosecution concerned about reversal would not be to avoid the use of coerced confessions but only to insure their verification by independent evidence. The prosecution might then be encouraged to supplement other evidence by introducing a coerced confession in order to guarantee a conviction. On review, it could defend the conviction on the ground that it was warranted by the independent evidence." (Meltzer, *Involuntary Confessions: The Allocation of Responsibility Between Judge and Jury* (1954) 21 U.Chi.L.Rev. 317, 354; see also, Note, *Arizona v. Fulminante: Extending Harmless-Error Analysis to the Erroneous Admission of Coerced Confessions* (1991) 66 Tul. L.Rev. 581, 591; Kamisar, *What Is an "Involuntary" Confession? Some Comments on Inbau and Reid's Criminal Interrogation and Confessions* (1963) 17 Rutgers L.Rev. 728, 737.)

Trial courts, anxious to preserve the products of their labor, are strongly motivated to avoid the commission of any error requiring automatic reversal. Use of a harmless error standard, by contrast, "provides another reduction in pressure on the trial court's scrutiny of the use of the coerced confession or its fruits." (Bloch, *Police Officers Accused of Crime: Prosecutorial and Fifth Amendment Risks Posed by Police-Elicited "Use Immunized" Statements*, 1992 U. Ill. L.Rev. 625, 656.)

The fifth and most important reason to preserve the automatic reversal standard is that it is the only standard that gives sufficient weight to the primal constitutional interest at stake. It has been written that "respect for the individual" is "the lifeblood of the law." (*Illinois* v. *Allen* (1970) 397 U.S. 337, 351 [25 L.Ed.2d 353, 363-364, 90 S.Ct. 1057] (conc. opn. of Brennan, J.).) In no area is this value tested more severely, nor is its implementation more critical, than in the official treatment of those accused of crime. In this context, "respect for the individual" demands, among other things, that agents of law enforcement refrain from all forms of trickery, coercion, and overreaching in the questioning of the accused.

Because the rule the majority adopts must inevitably weaken respect for this most fundamental constitutional value and increase the temptation to commit or to condone practices which undermine that value, I dissent.

Mosk, J., concurred.